724 F.Supp. 81 (1989)
UNITED STATES of America, Plaintiff,
v.
Dominic TADDEO, Defendant.
No. Cr. 89-59L.
United States District Court, W.D. New York.
October 30, 1989.
Gregory West, Sp. Atty., U.S. Dept. of Justice, Syracuse, N.Y., for plaintiff.
Herbert J. Lewis, Darweesh, Callen & Lewis, Rochester, N.Y., for defendant.

DECISION AND ORDER
LARIMER, District Judge.
Pending before the Court is defendant Taddeo's motion to suppress several firearms *82 that were seized from a box in the trunk of a rented car that he was driving when he was arrested on an indictment warrant on February 11, 1987. The court held a suppression hearing on the issue on September 11, 1989. Two witnesses testified for the Government, Robert E. Hutt, an Alcohol and Tobacco Firearms ("ATF") Agent and Paul Camping, an officer with the Rochester Police Department ("RPD"). The defendant did not testify and produced no evidence.

FACTS
The following facts were developed at the suppression hearing:
Defendant Taddeo and his girlfriend, Bertha Mungillo, were indicted on February 11, 1987, in Criminal Indictment No. 87-34L. The indictment warrant issued that same day.
In anticipation that a warrant would issue, several officers had defendant under surveillance in order that they might arrest him as soon as the warrant was obtained. These officers, including Camping and Hutt, were part of a task force involving officers from four separate police agencies: the Federal Bureau of Investigation (FBI), ATF, RPD and the Monroe County Sheriff's Department.
The officers had defendant under surveillance for about ten or fifteen minutes before they were properly positioned to make the arrest. At that point, several officers converged on defendant in their automobiles. At approximately 3:30 p.m. on February 11th, defendant was stopped. Defendant was alone in the vehicle, which was a late model Lincoln Town Car.
The Lincoln had been rented by Mungillo in her name on February 9, 1989, from Budget Rent-a-Car of Rochester, New York, using Mungillo's American Express Card. No mention of defendant is made on the service contract. In the space for "Additional Drivers" the rental agent typed "None Authorized." Defendant maintains that he had Mungillo's permission to drive the car. Officer Camping testified that the car's license plate number indicated that it was a rental car and they had verified that before they arrested Taddeo.
Uniformed RPD officers initially approached defendant and removed him from the car. ATF Agent Hutt then took defendant to a marked police car. Defendant was advised of his rights and he stated that he wanted to speak with a lawyer. Officers advised defendant that they were seeking Mungillo, and defendant provided some information as to where she might be located. Hutt testified that he told defendant that the car was going to be impounded and Hutt asked if there were any valuables in the car. Defendant's only response was that he wished to speak to a lawyer.
Shortly after that conversation, another ATF agent, Robert Izzo, took defendant's car keys and opened the trunk of the car. At this point, defendant was handcuffed and seated in the police cruiser. Agent Izzo and other officers on the scene noticed in the trunk an open box containing a sawed-off shotgun and several handguns.
Later on, after a search warrant for the car had been issued, agents seized the weapons. The Government seeks to use these weapons as evidence against defendant at trial.
At the suppression hearing, both Agent Hutt and Officer Camping testified that they decided to impound Taddeo's vehicle as soon as he was arrested. Officer Camping, an officer with the RPD for twenty years, testified that he had been involved in the investigation that led to the indictment of Taddeo in No. 87-34L. He testified that when Taddeo was arrested, his car was pulled over to the curb on Lake Avenue, a busy six-lane highway near the center of downtown Rochester. The car was stopped in a bus lane which was marked "No Standing" during rush hour, 7 to 9 A.M. and 4 to 6 P.M. In Camping's view, the car was in such a position that it had to be moved and impounded. In his view, the car was a hazard at that location at that time of day. In Camping's view, the car was towed for three reasons. First of all, it was stopped incident to Taddeo's arrest and it was necessary to remove the car to a safe location *83 should there be a later decision for further examination of the car by means of a warrant. He also believed that the car presented a hazard to other motorists since it was located in a restricted lane which would require buses and other vehicles to drive around it into heavy rush-hour traffic. In addition, he believed that the car was a rental car, valued at between $25,000 and $30,000 and that it had to be secured to protect it from vandalism or theft.

DISCUSSION
The Fourth Amendment guarantees the "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend IV. Defendant maintains that the guns were detected as the result of an unlawful intrusion into the trunk of the rented car he was driving, and that any objects seized as a consequence of that intrusion should be excluded from evidence at his trial.

The Issue of Standing
By its terms, "the Fourth Amendment protects people, not places." Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). In other words, Fourth Amendment claims cannot be asserted vicariously. Rakas v. Illinois, 439 U.S. 128, 133-34, 99 S.Ct. 421, 424-26, 58 L.Ed.2d 387 (1978); United States v. Smith, 621 F.2d 483, 486 (2d Cir.1980), cert. denied 449 U.S. 1086, 101 S.Ct. 875, 66 L.Ed.2d 812 (1981). "A person who is aggrieved by an illegal search of a third person's ... property has not had any of his Fourth Amendment rights infringed." Rakas, 439 U.S. at 134, 99 S.Ct. at 425.
Defendant, by claiming that police violated his Fourth Amendment rights, bears the burden of showing that his own rights were violated, and that he has standing to contest a search. Rakas, 439 U.S. at 138-39, 99 S.Ct. at 427-28 (1978). Because of the personal nature of Fourth Amendment rights, the Supreme Court has reasoned that the critical element necessary to establish standing is the defendant's legitimate expectation of privacy in the space invaded. Rawlings v. Kentucky, 448 U.S. 98, 104-05, 100 S.Ct. 2556, 2561-62, 65 L.Ed.2d 633 (1980); United States v. Paulino, 850 F.2d 93, 96 (2d Cir.1988), cert. denied, ___ U.S. ___, 109 S.Ct. 1967, 104 L.Ed.2d 435 (1989).
The Supreme Court has established a two-part analysis to determine whether a defendant had a reasonable expectation of privacy in the area searched: first, the defendant challenging the search must demonstrate his subjective expectation that the space invaded would remain private and, second, he must objectively show that society accepts that expectation as reasonable. California v. Greenwood, 486 U.S. 35, 108 S.Ct. 1625, 1628, 100 L.Ed.2d 30 (1988); followed in Paulino, 850 F.2d at 97.
Note that neither ownership nor possession of the space invaded automatically qualify such a subjective expectation as objectively reasonable. Paulino, 850 F.2d at 96. Expectations of privacy are related to, but need not wholly rely upon, a defendant's common-law interest in the property searched. Rakas, 439 U.S. at 143 n. 12, 99 S.Ct. at 430 n. 12 (defendant passengers in a co-defendant's getaway car lacked standing to contest an illegal search of the car which produced evidence leading to their robbery conviction).
In the instant case, defendant claims no ownership of the vehicle, of the box or of the weapons seized. It is undisputed that Mungillo rented the car under her name; it is undisputed that defendant's name appeared nowhere on the rental agreement. Indeed, Mungillo signed a rental contract specifically agreeing not to lend anyone the car. Defendant nonetheless predicates his standing argument in his moving papers on the fact that Mungillo gave him permission to use the rental car. In short, by the terms of Greenwood, defendant claims first that he had a subjective desire to keep the guns free from scrutiny and, second, that his expectation of privacy was objectively reasonable.
As to the first part of the Greenwood testdefendant's desire to keep the guns hiddenthis Court need make no finding. (Although, looking to defendant's conduct *84 under the circumstances, as well as to the possible consequences to him of weapons possession, his subjective desire to keep the guns private seems obvious.)
Defendant's claimed expectation of privacy fails the second part of the Greenwood test. Defendant essentially contends that, since all the items seized were locked in the trunk of the car he was driving, his expectation of privacy was reasonable. This contention lacks merit.
Counsel has not cited, nor has our research produced, any Second Circuit opinion squarely on pointthat is, whether a defendant in sole possession and control of an automobile rented by a third party who voluntarily lent him the car can assert standing to challenge a warrantless search of the vehicle. Other circuits have considered this precise question, however, and they have uniformly held that there is no reasonable expectation of privacy under these circumstances.
In United States v. Obregon, 748 F.2d 1371 (10th Cir.1984), the defendant was driving alone cross-country in a car rented by a friend in Miami when officers at a roadblock in New Mexico stopped him. On the pretext of a training exercise the officers obtained Obregon's permission to search the car and found cocaine stashed in his suit bag. Id.
Defendant [Obregon] had the keys to the car and may have had permission to use it, but this is not determinative of the standing inquiry in this case. Defendant was driving a rented vehicle and was not named on the rental agreement or any other documents, either as the renter or as an authorized driver. Defendant made no showing that any arrangement had been made with the rental car company that would have allowed him to drive the car legitimately.... Defendant's relationship to the rented car is too attenuated to support a claim of standing.
Obregon, 748 F.2d at 1374.
Defendant's relationship to the Lincoln Town Car rented by Mungillo mirrors the circumstances of Obregon in all essential aspects.
In United States v. McCulley, 673 F.2d 346 (11th Cir.1982), cert. denied, 459 U.S. 852, 103 S.Ct. 116, 74 L.Ed.2d 102 (1982), while searching for a missing luggage dolly allegedly used to commit a crime at the Atlanta airport, a private investigator working for the FBI searched a car which had been rented for two defendants by a co-defendant. The warrantless search of the rented car uncovered documentary evidence leading to the defendants' arrest and conviction. In ruling that the two defendants lacked standing to contest the search, the Eleventh Circuit noted that "[t]hey did not have a property or possessory interest in the automobile any greater than an alleged agreement to share expenses." 673 F.2d at 352.
In United States v. McConnell, 500 F.2d 347 (5th Cir.1974), cert. denied, 420 U.S. 946, 95 S.Ct. 1327, 43 L.Ed.2d 424 (1975), defendant McConnell had no legitimate expectation of privacy in a car that was initially rented by a co-defendant using McConnell's own American Express credit card, and then lent to McConnell with the co-defendant renter's permission. 500 F.2d 348. Like the expense-sharing agreement of McCulley, the use of McConnell's credit to rent the vehicle provided for McConnell an even greater connection between vehicle and driver than that alleged by defendant in the instant casenonetheless, defendant McConnell's claim of standing to contest the search was rejected.
In United States v. Zabalaga, 834 F.2d 1062 (D.C.Cir.1987), defendant Zabalaga had no legitimate expectation of privacy in a car rented by another and used without the renter's permission. In that case, defendant was arrested at a nightclub; evidence seized from a car rented by a co-defendant's employer for the co-defendant's business use helped to convict defendant of cocaine possession. The District of Columbia Circuit could discern "no meaningful distinction" between the search in Zabalaga and that in Rakas, supra, and upheld Zabalaga's conviction. 834 F.2d at 1065.
Clearly, defendant's connection to the Lincoln Town Car is as attenuated, or more *85 so, than those asserted by the defendants in the above cases. His expectation of privacy regarding the guns in the trunk was therefore not reasonable. Therefore, applying the Supreme Court's Greenwood criteria, I find that defendant lacks standing to contest Agent Izzo's search.

The Issue of Inevitable Discovery
Even if Taddeo did have standing to contest the search of the car, I find that the search did not violate his Fourth Amendment rights.
Since warrantless searches such as this one are presumptively unreasonable, Katz, 389 U.S. at 357, 88 S.Ct. at 514, the Government bears the burden of showing reasonableness. The Government has met this burden. The Government concedes that it cannot justify this search on the grounds that there was probable cause to believe weapons or contraband would be found in the trunk. Nor can the Government obtain solace from the fact that after the trunk was opened and the weapons observed, its agents obtained a search warrant. That search warrant stands or falls on the validity of the search of the trunk in the first place. The officers here cannot bootstrap their decision to search for evidence by obtaining a warrant after the evidence is discovered or after its existence has been confirmed through questionable police conduct.
Indeed, the Supreme Court has concluded that the best way to prevent improper police conduct is to exclude evidence seized as a result, notwithstanding the high social cost of letting persons obviously guilty go unpunished for their crimes. The Court's rationale is that the Government should never be put in a better position than it would have been had no improper police conduct occurred. Nix v. Williams, 467 U.S. 431, 443, 104 S.Ct. 2501, 2508-09, 81 L.Ed.2d 377 (1984). See also Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920).
By the same token, as Chief Justice Burger wrote for the Nix majority, "the prosecution is not [to be] put in a worse position simply because of some earlier police error or misconduct." Nix, id. (original emphasis).
If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... then the deterrent rationale has so little basis that the evidence should be received. Anything less would reject logic, experience, and common sense.
Nix, 467 U.S. at 444, 104 S.Ct. at 2509.
The Government justifies Agent Izzo's search of the trunk on the grounds that the automobile in question was properly impounded and therefore an inventory search was necessary, proper and inevitable. Even if the search of the trunk at the Lake Avenue scene was improper, the Government maintains that an inventory search subsequent to impoundment would inevitably have uncovered the guns in the trunk.

The Inventory Search Issue
"[I]nventory searches," Chief Justice Rehnquist has declared, "are now a well-defined exception to the warrant requirement of the Fourth Amendment." Colorado v. Bertine, 479 U.S. 367, 107 S.Ct. 738, 741, 93 L.Ed.2d 739 (1987). So long as such searches are not conducted for the sole purpose of investigation,
reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment, even though courts may as a matter of hindsight be able to devise equally reasonable rules requiring a different procedure.
Bertine, 107 S.Ct. at 742. See also Illinois v. Lafayette, 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1976).
In Bertine, supra, 107 S.Ct. 739-40, the police stopped defendant's van and arrested him for drunken driving. On the spot, before a tow truck arrived to take defendant Bertine's vehicle to the impoundment lot, one of the officers inventoried the van. He had no warrant. The officer opened a closed backpack in which he found drugs and other contraband. The van was then *86 towed, pursuant to police department regulations.
In South Dakota v. Opperman, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) Chief Justice Burger relied upon the diminished expectation of privacy in an automobile, and the "obviously public nature of automobile travel," as justifications to find inventory searches reasonable. He also relied upon the following specific public concerns:
When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobile's contents. These procedures developed in response to three distinct needs: The protection of the owner's property while it remains in police custody [cites omitted]; the protection of the police against claims for disputes over lost or stolen property [cites omitted]; and the protection of the police from potential danger [cites omitted]. The practice has been viewed as essential to respond to incidents of theft or vandalism [cites omitted].... [E]ven if an inventory is characterized as a "search," the intrusion is constitutionally permissible.
Opperman, 428 U.S. at 369-70, 96 S.Ct. at 3097-98. See also Bertine, 107 S.Ct. at 741.
In sum, the Second Circuit recently summarized the well-established rules concerning an automobile inventory search in United States v. Arango-Correa, 851 F.2d 54, 59 (1988), as follows:
An inventory search pursuant to standardized procedures will be upheld unless there is a showing that the Government acted in bad faith or searched the car for the sole purpose of investigation, Colorado v. Bertine, 479 U.S. 367, 372, 107 S.Ct. 738, 741-42, 93 L.Ed.2d 739 (1987); South Dakota v. Opperman, 428 U.S. 364, 373, 96 S.Ct. 3092, 3099, 49 L.Ed.2d 1000 (1976); Cooper v. California, 386 U.S. 58, 61-62, 87 S.Ct. 788, 790-91, 17 L.Ed.2d 730 (1967).
In the instant case, the Government has amply demonstrated that police impoundment of the Lincoln was designed to address the very concerns described by Chief Justice Burger in Opperman and amplified by Chief Justice Rehnquist in Bertine. Taddeo was stopped and arrested pursuant to federal warrant. Defendant was alone in the car; nobody accompanied him who could safeguard it or remove it. The car came to rest in a bus lane on a very busy street just prior to evening rush hour. It would have been necessary in any event to tow the car within a short time to clear the lane for traffic.
The police were properly concerned that the expensive vehicle may have been damaged, either by passing traffic or by vandals, thereby exposing RPD to potential civil liability. The police knew that the car was rented, diminishing defendant's property interest in the vehicle and heightening the possibility of loss to a third party such as the rental agency. Aware that the vehicle would ultimately have to be returned to that agency, and its contents removed beforehand, the police had even more reason to conduct an inventory to find and sequester any of defendant's belongings, especially since Taddeo had declined to provide any information about the vehicle.
This search also complied with the Bertine requirement that inventories be conducted according to "standardized criteria." Bertine, 107 S.Ct. at 742 n. 6. RPD regulations taken in evidence state:
Prior to towing, the officer will ... [i]nspect all accessible areas of the vehicle and remove therefrom any articles of value. These articles will be inventoried ... and delivered to the property clerk's office. The inventory will be included on the PAAT [Parking, Accident, Arrest, Towing] form (or) the Vehicle Report Form in any case where property is removed from a vehicle being towed....
Gov't Ex. A: "Vehicle Towing, Vehicle Storage, Towed Vehicle Security," Rochester Police Dep't Gen. Order No. 81-5 (June 8, 1981). Cf. Bertine, 107 S.Ct. at 739 n. 1 (comparable section of the Boulder, Colorado, Revised Code).
Nothing indicates that the RPD officers on the scene failed to follow these instructions. *87 Cf. Arango-Correa, 851 F.2d at 59. Defendant acknowledges this, but contends that the above regulations, at least as followed by the officers arresting him, invest police with too much discretion to decide whether to tow the car and inventory it.
The Supreme Court explicitly addressed this concern in Bertine and rejected a similar argument. Indeed, the Chief Justice concluded that
Nothing ... prohibits the exercise of police discretion so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity.
Bertine, 107 S.Ct. at 743.
It is clear that it was standard procedure for the police to tow and impound the vehicle under the circumstances presented here. On these facts, the police had little choice but to impound the car. Clearly the decision to do so was reasonable and not merely a subterfuge to obtain evidence.
I am satisfied by the evidence that the vehicle was properly taken into police custody, that an inventory was inevitable, and therefore the contents would have been admissible under the rule of Nix v. Williams, supra, 467 U.S. 431, 443, 104 S.Ct. 2501, 2508-09, 81 L.Ed.2d 377 (1984); see United States v. Gorski, 852 F.2d 692, 696-97 (2d Cir.1988).
Finally, defendant contends that for this Court to deny suppression of this evidence would encourage police misconduct in violation of the Fourth Amendment. To this end, defendant cites People v. Stith, 69 N.Y.2d 313, 514 N.Y.S.2d 201, 506 N.E.2d 911 (1987), for the principle that inevitable discovery should be applied only to "secondary" evidence indirectly obtained as a result of police misconduct or mistake, and not to "primary" evidence seized as a direct result of that conduct, such as the weapons in the trunk. Stith, 69 N.Y.2d at 319, 514 N.Y.S.2d 201, 506 N.E.2d 911. He further argues that, since local police procedures were followed in the vehicle impoundment in this case, New York law should apply.
This reasoning is unsound. There is no requirement that this court apply New York law to this case; the arrest was pursuant to a federal warrant for alleged violations of federal law and was executed by a task force of officers acting under federal authority. See United States v. Burke, 517 F.2d 377, 382-83 (2nd Cir.1975). Furthermore, the Second Circuit has expressly rejected the direct-indirect evidence distinction drawn in earlier inevitable discovery cases. See, e.g., United States v. Whitehorn, 829 F.2d 1225, 1232 (2d Cir.1987), cert. denied, ___ U.S. ___, 108 S.Ct. 2907, 101 L.Ed.2d 939 (1988); United States v. Pimentel, 810 F.2d 366, 368-70 (2d Cir. 1987).
In sum, then, to exclude the guns seized in this case would be to ignore the concerns the Supreme Court expressed in Nix when it repeated the words of Justice, then Judge, Cardozo:
[If exclusion were permitted here, t]he pettiest peace officer would have it in his power through overzeal or indiscretion to confer immunity upon an offender for crimes the most flagitious.
Nix, 467 U.S. at 447-48, 104 S.Ct. at 2511, quoting People v. Defore, 242 N.Y. 13, 21, 150 N.E. 585 (1926).

CONCLUSION
Defendant has no standing to contest the search of the vehicle. Even if he has such standing, the search was a reasonable inventory search and there is no Fourth Amendment violation.
Defendant's motion to suppress the evidence seized from the trunk of the vehicle is in all respects denied.
IT IS SO ORDERED.