USCA1 Opinion

 

 December 31, 1992 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ____________________ No. 92-1255 UNITED STATES, Appellee, v. WILBERTO RAMOS-MORALES, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Juan M. Perez-Gimenez, U.S. District Judge] ___________________ ____________________ Before Breyer, Chief Judge, ___________ Bownes, Senior Circuit Judge, ____________________ and Boudin, Circuit Judge. _____________ ____________________ Jose R. Aquayo for appellant. ______________ Carlos A. Perez, Assistant United States Attorney, with whom ________________ Daniel F. Lopez Romo, United States Attorney, was on brief for _______________________ appellee. ____________________ ____________________ BREYER, Chief Judge. Federal agents of the Drug ____________ Enforcement Agency ("DEA") arrested the defendant on drug charges. At that time, the defendant parked his car on the side of the road. The agents seized the car, impounded it, searched it, and found evidence that was later introduced at trial. The single issue on this appeal is whether the seizure of the parked car was lawful. The district court held that the seizure amounted to a "reasonable," hence lawful, impoundment of the car to prevent theft or vandalism. We agree. The basic facts, presented in the light most favorable to the government (whose witnesses the court explicitly credited), see, e.g., United States v. Newton, ___ ____ _____________ ______ 891 F.2d 944, 946 n.2 (1st Cir. 1989), are as follows: 1. On July 12, 1991, two DEA agents, armed with an arrest warrant for the defendant, Wilberto Ramos Morales, spotted a man fitting Ramos' description, emerging from a white, two-story, apartment house on Calle Tulipan, in Carolina, Puerto Rico. A passerby told the agents that the man was indeed Ramos. 2. The agents saw Ramos enter his car, parked on the sidewalk next to the house. Calle Tulipan is a dead end street. Ramos drove the car towards the far end of the street and turned it around. The officers blocked the open end of the street with their car, emerged from their car with weapons, pointed them at Ramos in his car, and told Ramos to stop. 3. Ramos, whose car was then "in the middle of the street," moved his car "towards the edge of the road," and stopped it "on the edge of the street." Ramos then got out of the car, the agents "put him in front of the vehicle with his hand[s] on top of it," and one of the agents took the keys from the "top of the car," where Ramos had left them. 4. After arresting Ramos, the agents, following "DEA standard procedures," which apparently instruct agents not to "leave" a "vehicle in an unknown location," took the car "for protection and security purposes," -- i.e., "to protect" Ramos' "property" and "for the safety of the vehicle itself." 5. The agents testified that they did not know where Ramos "usually lived or where he usually stayed." They had a list of five addresses they were to check in an effort to find him. The Calle Tulipan address was the last on the list. Ramos' car had a BCK license plate, registered at what was apparently a different ("Country Club" district) Ramos address. These facts would seem to bring this case well within the scope of the many precedents finding police impoundment to protect a car from theft or vandalism reasonable, and hence lawful. The Supreme Court itself has held that police may impound a car for this reason, provided they make their impoundment decision "according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." Colorado v. Bertine, 479 ________ _______ U.S. 367, 375 (1987). Lower courts have found that the police may lawfully impound a vehicle that would otherwise -3- 3 remain on the side of a public highway or city street, see ___ Rodriguez-Morales, 929 F.2d 780 (1st Cir. 1991), cert. _________________ _____ denied, 112 S.Ct. 868 (1992); United States v. Velarde, 903 ______ _____________ _______ F.2d 1163 (7th Cir. 1990); United States v. Duncan, 763 F.2d _____________ ______ 220 (6th Cir. 1985); United States v. Griffin, 729 F.2d 475 _____________ _______ (7th Cir.), cert. denied, 469 U.S. 830 (1984); United States _____ ______ _____________ v. Taddeo, 724 F. Supp. 81 (W.D.N.Y. 1989), aff'd, 932 F.2d ______ _____ 956 (1st Cir. 1991); or in a private parking lot, see United ___ ______ States v. Kornegay, 885 F.2d 713 (10th Cir. 1989), cert. ______ ________ _____ denied, 495 U.S. 935 (1990); United States v. Johnson, 734 ______ _____________ _______ F.2d 503 (10th Cir. 1984); United States v. Staller, 616 _____________ _______ F.2d 1284 (5th Cir.), cert. denied, 449 U.S. 869 (1980). _____ ______ The appellant tries to distinguish these cases by arguing that he parked his car off the street in a private ___ parking place just outside his home. The main problem with this argument is factual. We must read the record favorably to the government, and the government's witnesses (whom the court generally credited) testified that the car was left "on the edge" of the road outside a building that they "did not know" (and reasonably need not have believed) was Ramos' home. The dissent tries to distinguish these cases by pointing out that the street in question is not a busy -4- 4 public street where a long-parked car might seem out of place, inviting theft or harm; that it is not a private parking lot, belonging to another person; and that the agents had no reason to think the street was located in an especially crime-ridden area. But these distinctions do not seem convincing. For one thing, the significant risk that an abandoned car will be stolen or damaged does not seem confined to busy streets, "high crime" neighborhoods, or commercial parking lots. For another, the agents here, in impounding the car, followed standard DEA procedures. The existence and uniform application of such standard procedures can help prevent what the dissent sees as a major threat to privacy interests, namely that arresting officers will use "theft-prevention impoundment" (and the inventory search that usually follows) as a pretext for initiating searches for evidence of criminal activity. See Bertine, 479 ___ _______ U.S. at 375-76. Finally, and perhaps most importantly, the Supreme Court in Bertine seemed specifically to hold that the _______ Constitution permits arresting officers to impound, pursuant to standard procedures, an arrested person's automobile that might otherwise be left abandoned. Id. This result, the __ Court said, reflects the government's legitimate interest in -5- 5 reducing automobile theft and damage, the individual's diminished expectation of privacy in an automobile, and the tendency of clear, standard rules to control police abuses. Cf. South Dakota v. Opperman, 428 U.S. 364, 373 (1976) __ _____________ ________ (according deference to police caretaking procedures designed to secure and protect vehicles and their contents within police custody). We do not see any significant distinction between the case at bar and that controlling authority, particularly as supplemented by the cases cited on pages 3 -4, supra. Indeed, Bertine, as far as the _____ _______ Supreme Court's opinion there reveals, is identical to this case, but for the fact that the Bertine car was likely at _______ the side of the road (the police having stopped, and presumably pulled over, the drunk driver) near a busy _____________ intersection, while the car in this case was at the side of ____________ the road in a residential neighborhood. (The dissent's _______________________________ claim that the police in Bertine "could not have left the _______ car where it was located at the time of Bertine's arrest" lacks any basis in the Supreme Court's description; indeed the police here seem to have had the authority to have left the car parked and locked.) And, as we have said, the distinction between busy, and nonbusy, streets, in terms of that Supreme Court case, and a host of later cases, seems a -6- 6 distinction without a difference. To hold that busy arresting officers must leave a suspect's car behind if they lack information about the surrounding neighborhood's crime rate runs contrary to the rationale that underlies the case law authority, for it invites the very kinds of risks that the cases hold justify impoundment procedures such as the one here at issue. Given the extensive authority, this case seems to us basically to involve application of, not any extension of, existing law. And, we have not considered the case as if we were writing Fourth Amendment law on a blank slate. For these reasons, the judgment of the district court is Affirmed. ________ -7- 7 BOWNES, Senior Circuit Judge, dissenting. Once _____________________ again the Fourth Amendment has become a casualty of the "War on Drugs." The majority opinion treats the warrantless seizure of an automobile by the Drug Enforcement Administration as a routine matter and approves the seizure simply because the agents said that they followed DEA "standard procedures." I do not think that the requirements of the Fourth Amendment should be so cavalierly shunted aside. I start with the standard of review. A district court's findings in a suppression hearing are binding on appeal unless they are clearly erroneous. United States v. _____________ Lanni, 951 F.2d 440, 441 (1st Cir. 1991). This means that we _____ review the record of the suppression hearing in the light most favorable to the government. But our review does not end there. The district court's "ultimate conclusion" must be subjected to "plenary review." United States v. Sanchez, ______________ _______ 943 F.2d 110, 112 (1st Cir. 1991). See also, United States ___ ____ _____________ v. Ibarra, 955 F.2d 1405, 1409 (10th Cir. 1992) ("[a]lthough ______ the district court's factual findings are subject to a `clearly erroneous' standard of review, the ultimate determination of the reasonableness of . . . [an officer's] seizure and search is a question of law to be reviewed by this court de novo."). -8- 8 The court of appeals must also bear in mind that when a criminal defendant moves to suppress evidence seized without a warrant in violation of the Fourth Amendment, the government bears the burden of proving that the warrantless seizure falls within one of the narrow exceptions to the warrant requirement of the Fourth Amendment. As the Court has stated: Over and again this Court has emphasized that the mandate of the Amendment requires adherence to judicial processes. See Weeks v. United States, 232 U.S. 383 ___ _____ ______________ (1914); Agnello v. United States, 269 _______ _____________ U.S. 20 (1925). Only where incident to a valid arrest, United States v. _______________ Rabinowitz, 339 U.S. 56 (1950), or in __________ "exceptional circumstances," Johnson v. _______ United States, 333 U.S. 10 (1948), may an _____________ exemption lie, and then the burden is on those seeking the exemption to show the need for it, McDonald v. United States, ________ _____________ 335 U.S. 451, 456 (1948). United States v. Jeffers, 342 U.S. 48, 51 (1951). See also, ______________ _______ ___ ____ United States v. Carbajal, 956 F.2d 924, 930 (9th Cir. 1992) ______________ ________ (burden is on government to show reasonableness of warrantless search including demonstrating that search comes within one of the narrow exceptions to warrant requirement); Ibarra, 955 F.2d at 1409-10 (government bears burden of ______ showing warrantless seizure of auto satisfies exception to Fourth Amendment); United States v. Rutkowski, 877 F.2d 139, _____________ _________ 141 (1st Cir. 1989) (government has burden of establishing entitlement to "plain view" exception to Fourth Amendment's warrant requirement); Wayne R. LaFave, 4 Search and Seizure, -9- 9 11.2(b) at 218 n. 23 (2d ed. 1987 & Supp. 1991) (government always has burden of proving applicability of exception to warrant requirement). I now turn to the law on impoundment of motor vehicles which the majority either ignores or misstates. The United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ." U.S. Const. amend. IV. Generally, a search of private property is unconstitutional unless it is conducted pursuant to a properly issued search warrant. Katz v. United States, ____ _____________ 389 U.S. 347, 357 (1967). In a limited number of situations, however, warrantless searches have been upheld as "reasonable." One such exception to the warrant requirement arises when the police, in the exercise of their "community caretaking functions," Cady v. Dombrowski, 413 U.S. 433, 441 ____ __________ (1973), acquire temporary custody of a privately-owned automobile. In such circumstances the Supreme Court has held that a warrantless inventory search of the automobile made "pursuant to standard police procedures" and for the purpose of "securing or protecting the car and its contents" is a reasonable police intrusion which does not offend Fourth Amendment principles. South Dakota v. Opperman, 428 U.S. ____________ ________ 364, 372 & 373 (1976). In Opperman, the police impounded a ________ vehicle which had been parked in a no-parking zone. The -10- 10 Court stated that the "authority of the police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." Id. at 369. ___ The Opperman Court identified three distinct ________ interests which justify the inventory search of an automobile: (1) protection of the owner's property while in police custody; (2) protection of the police against claims regarding lost or stolen property; and (3) protection of the police from potential danger. Id. Before the need to ___ protect these interests can arise, however, "the government must have legitimate custody of the property to be inventoried." United States v. Jenkins, 876 F.2d 1085, 1089 _____________ _______ (2d Cir. 1989) (citations omitted). See Illinois v. ___ ________ Lafayette, 462 U.S. 640, 648 (1983); United States v. Pappas, _________ _____________ ______ 613 F.2d 324, 330 (1st Cir. 1979). The DEA agents testified at the suppression hearing that they impounded the vehicle to protect it from the risk of theft or vandalism, "and as part of the rules of the agency." The agents' perceived risk of theft or vandalism, however, was not supported by any facts regarding the character of the neighborhood, nor were the "rules of the agency" explained or put in evidence. The only evidence before the court was that the car was legally parked at the edge of a public street in a residential neighborhood. The -11- 11 district court accepted the agents' "safety" justification without question and did not rely on the existence of DEA standard procedures to justify the seizure. The issue, therefore, is whether the agents were, under the facts of this case, justified in impounding Ramos' car to protect it and its contents. "Framed precisely, the critical question in cases such as this is not whether the police needed to impound the vehicle in some absolute sense, or could have effected an impoundment more solicitously, but whether the decision to impound and the method chosen for implementing that decision were, under all the circumstances, within the realm of reason." United States v. Rodriguez-Morales, 929 _____________ _________________ F.2d 780, 786 (1st Cir. 1991), cert. denied, 112 S. Ct. 868 _____ ______ (1992). The majority relies heavily on the Supreme Court's decision in Colorado v. Bertine, 479 U.S. 367 (1987). I read ________ _______ the Bertine facts differently than my brothers. In Bertine _______ _______ the Court upheld municipal regulations of Boulder, Colorado, that gave its police officers the discretion to choose between impounding a car and parking and locking it in a public parking place, "so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." Id. at 375. Bertine does not control the facts ___ _______ of this case, as the majority mistakenly asserts. In -12- 12 Bertine, the officers could not have left the car where it _______ was located at the time of Bertine's arrest for drunk driving; they had to choose between parking the vehicle in a public lot or impounding it. The Court determined that the grant to the officers of such discretion and their exercise of that discretion were both reasonable. In this case, the officers had no reason to move Ramos' car. It was legally parked in a residential neighborhood. There was no evidence that the car was interfering with traffic, either automotive or pedestrian, in any way. The DEA agents stressed that the car was impounded to protect it from vandalism, but there was no evidence that cars parked in the neighborhood had been vandalized regularly or intermittently. The question here is not, as it was in Bertine, whether the police appropriately exercised their _______ discretion to impound the car because they had to move it. Instead, the question is whether it was reasonable for the agents to impound the vehicle given the fact that it was lawfully parked in a residential area at the time of arrest. Courts have upheld the reasonableness of decisions by law enforcement officials to impound vehicles in cases where leaving the vehicle where it was would either pose a threat to public safety or present an inviting target for thieves or vandals. See, e.g., Rodriguez-Morales, 929 F.2d ___ ____ _________________ at 785 (shoulder of a busy interstate highway when no -13- 13 occupant properly licensed to drive); United States v. ______________ Velarde, 903 F.2d 1163, 1166-67 (7th Cir. 1990) (same); _______ United States v. Kornegay, 885 F.2d 713, 716 (10th Cir. 1989) _____________ ________ (parked in private lot and police did not know identity of operator), cert. denied, 495 U.S. 935 (1990); United States ____ ______ _____________ v. Brown, 787 F.2d 929, 932 (4th Cir.) (occupants appeared _____ drunk, no known sober person was available to take custody, and car, if left unattended, could present a nuisance), cert. ____ denied, 479 U.S. 837 (1986); United States v. Duncan, 763 ______ _____________ ______ F.2d 220, 224 (6th Cir. 1985) (arrest on public highway); United States v. Johnson, 734 F.2d 503, 505 (10th Cir. 1984) ______________ _______ (parked in private lot, exposed to vandalism, and owner was inebriated); United States v. Griffin, 729 F.2d 475, 480 (7th _____________ _______ Cir.) (neither occupant could legally remove car from emergency lane of highway and leaving it there would present hazard and theft risk), cert. denied, 469 U.S. 830 (1984); ____ ______ United States v. Staller, 616 F.2d 1284, 1289-90 (5th Cir.) _____________ _______ (legally parked in shopping mall parking lot, but arrested driver was from out of state and nobody else was available to assume responsibility), cert. denied, 449 U.S. 869 (1980); ____ ______ United States v. Taddeo, 724 F. Supp. 81, 82-3 (W.D.N.Y. ______________ ______ 1989) (stopped in a bus lane on a busy six-lane highway near the center of downtown Rochester just prior to rush hour), aff'd, 932 F.2d 956 (2d Cir. 1991); United States v. 1988 _____ ______________ ____ B.M.W. 750IL, 716 F. Supp. 171, 173-74 (E.D. Pa.) (no _____________ -14- 14 licensed driver available to remove vehicle parked near street corner and exposed to risk of theft or vandalism), aff'd without opinion, 891 F.2d 284 (3d Cir. 1989). _____________________ The majority cites many of these same cases in support of its conclusion that the impoundment of Ramos' car was legal. In so doing, the majority has failed to consider the factual differences between the cited cases and this case. Despite the clear factual differences from the line of cases supporting the reasonableness of decisions to impound vehicles for the protection of either the owner or the public, the district court accepted the agents' unsupported conclusions about the risks associated with leaving Ramos' car where it was: legally parked "at the edge of the street." Now the court of appeals compounds this error. The district court did find that two factors supported the reasonableness of the agents' determination that there would have been a serious threat of theft or vandalism had they left the vehicle where it was parked: first, that the officers were unsure about the actual residence of Ramos; and, second, that several people witnessed the arrest. In the words of the district court: at the time of the arrest, the agents were uncertain of the defendant's actual residence. Under these circumstances, the agents could have reasonably concluded that the defendant's vehicle could be subject to theft or vandalism if it remained parked where it was, -15- 15 especially in light of the fact that several persons witnessed the arrest. Despite the reasonableness of the agents' uncertainty about Ramos' actual residence, that uncertainty had no significance for the perceived risk of theft or vandalism of his automobile. Those risks existed independently of Ramos' actual residence. Such risks are dependent upon the character of the neighborhood and the propensity for car theft and vandalism in the area. After all, the odds of the car being stolen or vandalized are less for a stranger who parks his car in an area with a low rate of car theft, than those for a resident of a high-risk area who parks his car outside his home. There was no evidence offered by the government at either the suppression hearing or the trial to support the characterization of the neighborhood in which Ramos and his car were found as one with either a high or low risk for car theft or vandalism. The location of the actual residence of Ramos is irrelevant to this determination. The alleged DEA "policy" against leaving vehicles of arrestees in "unknown locations" is overbroad, if not completely irrational. The second, and connected, reason supplied by the court in support of its ruling, that there were witnesses to the arrest, is simply not supported in the record of the suppression hearing. At the suppression hearing, the question of whether others were present near the scene of -16- 16 arrest arose on four occasions. First, Agent Ramirez testified in response to questions posed by the prosecutrix about what happened when he asked a bystander whether the person he saw get into the Honda Accord was, in fact, Ramos: A I asked the person who was near on the house next to where his car was parked if he was Willy, and that person responded in the affirmative . . . . . . . . Q What happened to that individual that you had inquired from, if he was Willy? A At that moment I don't know what happened to him. Q Was he there when you arrested defendant Ramos Morales? A No madam, he was not. Second, Agent Ramon testified about what the agents did when they first spotted the Honda Accord registered in the name of Ramos: A [S]ince [we] did not see anybody on the streets we decided to wait, and so we established surveillance on that street which is a dead end street. Third, on cross-examination, Ramon testified that he did not remember seeing Vadiz next to Ramos' car just prior to the moment when Ramos entered his vehicle: Q [D]id you see another man next to that car, immediately next to Mr. Ramos's car? A Not that I recall, Sir. -17- 17 Fourth, Vadiz, as a witness for the defendant, testified that he was present at the scene of the arrest and that DEA agents prevented Ramos from giving him custody of the car. The district court, in its suppression order explicitly rejected this testimony, stating: "[t]he agents further testified that the 19-year-old neighbor was not present at the time of defendant's arrest. After hearing the testimony of the agents and that of the neighbor, the Court finds the testimony of the agents more credible than that of Guido [sic] Vadiz." Therefore, there was no evidence in the record of the suppression hearing supporting the district court's finding that "several persons witnessed the arrest."1 Even if there had been such evidence at the suppression hearing, or at the trial itself, such evidence, without more, would not support a finding of probable cause to seize a vehicle without a warrant. It is difficult to imagine any arrest in a major urban area which is not witnessed by at least one bystander. Were that sufficient reason to justify the seizure of a car at the time of arrest, the limited exception to the warrant requirement based on exigent circumstances, such as the protection of public safety or the prevention of ____________________ 1 According to the government's own brief, "prior to the arrest, there were neighbors in the immediate area. During and after the arrest no one was within sight." Brief for Appellee at 9 n.5. -18- 18 theft or vandalism, would soon swallow the rule. As the Tenth Circuit has noted, "Opperman cannot be used to justify ________ the automatic inventory of every car upon the arrest of its owner. The justifications for the rule are too carefully crafted for this to be the intent." United States v. Pappas, _____________ ______ 735 F.2d 1232, 1234 (10th Cir. 1984). In United States v. Pappas, 613 F.2d 324 (1st Cir. _____________ ______ 1979), this court held that even when the government impounds a vehicle because its agents have reason to believe that it is subject to forfeiture under 21 U.S.C. 881(b)(4), it must fulfill the warrant requirement in the absence of exigent circumstances. Id. at 330. The Second Circuit recently ___ agreed, holding that warrantless seizures under 881(b)(4) "must meet one of the recognized exceptions to the fourth amendment's warrant requirement." United States v. Lasanta, ______________ _______ Nos. 91-1724, 91-1725, 92-1008, 1992 Allfeds WL 297090, at *3 (2d Cir. Oct. 21, 1992). If the warrant requirement must be met in cases where the government has a legitimate, statutory justification for impounding a vehicle, surely the existence of a vague "agency policy" is no substitute for a warrant in the circumstances presented by this case. Bertine does not _______ ___ stand for the proposition that so long as a DEA agent claims to be following standard procedures, he can seize an automobile without a warrant. In Bertine, the Court merely _______ -19- 19 held that when the police must remove a car from the scene of an arrest, they may, in accord with standard procedures, either park and lock the car in a public place or impound the vehicle and conduct an inventory search. The predicate to the Bertine rule was not met in this case. There was no _______ evidence showing that the agents had any legitimate reason to move Ramos' vehicle. The majority has extrapolated from Bertine how the Court would _______ decide this case. This may be a reasonable prediction, but I think we are restricted to the facts and holdings of Bertine _______ as it was issued. In summary, a careful review of the record reveals that there was no evidence before the district court that Ramos' car was located in an area that exposed it to the risk of vandalism or theft, and the district court did not take judicial notice that the car was parked in such a neighborhood. There was no evidence to support the court's finding that there were witnesses to the arrest. The lack of certainty about the actual residence of Ramos was irrelevant as to whether sufficient exigent circumstances existed to justify the warrantless seizure of his automobile. Given the lack of supporting evidence in the record, I cannot join the majority. The majority completely ignores the issue of burden of proof. The government bears the burden of proof whenever -20- 20 it seeks to justify warrantless seizures. Today, despite a lack of any supporting evidence, this court affirms the agents' naked conclusion that leaving Ramos' car where it was parked when Ramos was arrested presented a risk of theft or vandalism. This means that in the future, any time a DEA agent seizes a suspect's automobile without a warrant, all she need say is that she did so "to protect the car from the dangers of theft and vandalism." DEA agents will now surely wait until a suspect gets into his automobile before effecting an arrest because, once the suspect is arrested, the agents can impound the car and conduct an inventory search withoutprobablecauseand intheabsence ofexigentcircumstances. Today's decision is not compelled by current constitutional doctrine. As a court of appeals, we must recognize that our first duty is to uphold the Constitution as it has been interpreted by the Supreme Court. We ought not diminish and circumscribe the protections of the Bill of Rights in the absence of a clear command by the Supreme Court. The majority gives judicial sanction to the impermissible seizure of a citizen's automobile that violates the requirements of the Fourth Amendment. This ruling is, lamentably, another step in the judicial erosion of the freedoms guaranteed by the Bill of Rights. -21- 21