**UNITED STATES of America,**

**v.**

**Juan PENA, a/k/a Jose Rafael Allende Navarro, Defendant.**

**Criminal No. 95–10254.**

United States District Court, D. Massachusetts.

April 29, 1996.

Thomas M. Sobol, Brown, Rudnick, Freed & Gesmer, Boston, MA, for Edwin Ojeda, Defendant.

Henry F. Owens, III, Lane, Altman & Owens, Boston, MA, Ronald Ian Segal, Lynn, MA, for Juan Pena.

Michael D. Ricciuti, U.S. Attorney's Office, Boston, MA, Allison D. Burroughs, United States Attorneys Office, Boston, MA, for U.S.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### I. *Introduction*

Defendant, Juan Pena, has moved to suppress evidence on the ground that the police conducted an illegal warrantless search of his apartment. The government contends that the initial entry was a valid protective sweep, Pena voluntarily consented to the search, and, in any event, the search was valid under the "independent source" doctrine, pursuant to a subsequently obtained search warrant. After conducting two evidentiary hearings, the Court concludes that the protective sweep was unlawful and the verbal consent was involuntary. However, Defendant's motion to suppress must be **DENIED** under the "independent source" doctrine.

### II. *Factual Background*

#### A. *Second Floor Search*

On August 14, 1995, federal and state law enforcement officers executed a "no-knock" search warrant for an apartment on the second floor of 114A–114B Ames Street, a three-floor apartment building in Lawrence, Massachusetts. The warrant was based upon information supplied by a confidential informant who made a controlled purchase of cocaine at that location from a hispanic male later identified as Edwin Ojeda. The informant had also told the police that this target had a gun, which triggered the no knock request.

Seven officers were involved in the operation: Drug Enforcement Administration ("DEA") Special Agents Pamela Mersky, Robert Kew and Edward Mastrocola; Massachusetts State Troopers Brian O'Neil and William Canty; and Lawrence Police Detectives Dana Difiore and Anthony Lorenzo. Trooper O'Neil and Agent Mersky coordinated the other officers' activities.

Prior to the search, Trooper O'Neil also heard from his confidential informant that a person living on the third floor delivered drugs to the second floor during the controlled buy. The informant came to the conclusion that the "big guy" lived on the third floor because the occupant of the second floor made a phone call during the transaction and asked the person on the other end of the line to "come down" with additional drugs. He appeared moments later, thus giving rise to the inference that he was on the third floor.

In addition, prior to the raid, O'Neil received a tip from a Lawrence police detective, Michael Laird, that the second and third floors were involved in a joint drug distribution operation.[1] Indeed, the Lawrence Police had stopped Pena on July 28, 1995, for interrogation because he was leaving a "drug house." Trooper O'Neil did not attempt to secure a search warrant for the third floor, however, because he did not believe that the information provided by the confidential informant and the Lawrence police was sufficient to establish probable cause.

When the officers executed the "no-knock" warrant for the second floor, several persons, including Ojeda, a second hispanic male, a woman, and one or more small children, fled the apartment through a back door and down a flight of stairs where other officers intercepted them. Trooper O'Neil caught a glimpse of another male exiting the apartment and fleeing upstairs. In the commotion he did not get a clear look at him, nor did he pursue him immediately.

---

1. Laird received this information from his own confidential informant pursuant to an independent investigation by the Lawrence police.

The officers returned the second floor occupants to the apartment and conducted a search that yielded a one-kilogram package of cocaine, wrapped in gray duct tape and sealed in wax, packages containing a total of more than 50 grams of cocaine base ("crack" cocaine), and drug paraphernalia, all of which was hidden in a compartment under the kitchen sink. This is where the confidential informant said the drugs were stored. No guns or other weapons were discovered. Ojeda and the other male were then placed under arrest and handcuffed.[2]

## B. *Third Floor Searches*

### 1. The First Search of the Third Floor

Approximately fifteen minutes after securing the second floor apartment and discovering the drugs, Troopers O'Neil and Canty proceeded to the third floor. The troopers knocked and identified themselves, and an hispanic male, later identified as Pena, answered the door. O'Neil could not recognize him as the man he had seen flee the second floor. Without requesting consent to enter, Trooper O'Neil pushed past Pena and conducted a brief "protective sweep" of the premises for safety reasons to discover whether anyone else was present. Trooper Canty remained with Pena just straddling the apartment threshold.

Immediately following the protective sweep, Trooper O'Neil returned to the apartment entrance, where he noticed wrapping material made of duct tape and sealing wax, in plain view on top of a waste basket. This waste basket was located near the apartment's front door, which opened on the kitchen. Trooper O'Neil called Pena's attention to the wrapping in response to which Pena shrugged his shoulders.

At this point, Trooper O'Neil asked Pena in English whether he could search the

apartment. O'Neil immediately learned, however, that Pena's knowledge of English was extremely limited. Pena answered Trooper O'Neil with words to the effect of "look, look, no problemo, no destructo." Trooper O'Neil took Pena's response to mean that he had consent to search the apartment as long as he was not destructive. However, because of concern about the language barrier, O'Neil decided to wait for another police officer or agent who could speak Spanish. While not in custody, Pena was not free to leave.

While waiting, Trooper O'Neil escorted Pena, without handcuffs, to the second floor apartment where he was presented to Ojeda and the other male being held there in handcuffs. Pena denied knowing them and vice versa. Troopers O'Neil and Canty then escorted Pena back to the third floor. Ojeda was not informed that the wrapping had been discovered during the protective sweep.

After Pena was escorted back upstairs, O'Neil returned to the second floor. At some point soon afterwards, Ojeda informed the officers that he had cooperated in the past with the Lowell Police Department. He said he did not own the drugs that were found in his apartment but was instead simply guarding them for the "guy upstairs." Ojeda also told the officers that Pena had additional drugs hidden in his apartment. Ojeda initially volunteered this information on his own initiative, not in response to police questioning. He had not been given *Miranda* warnings. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

At this point, Agent Mersky decided that she had sufficient probable cause based on Ojeda's statements, the discovery of the drugs, and the corroborative informant information, to seek a warrant for the third floor. She called a conference of the other officers,

---

**2.** The search of Ojeda also uncovered a set of keys, including a key to the third floor apartment; however, the police did not associate the keys with the third floor apartment until after they searched it. As a result, the fact that Ojeda possessed a third floor key is irrelevant to the Court's analysis regarding the reasonableness of the later search of the third floor. In deciding whether an officer's conduct was based on probable cause or reasonable suspicion, the Court

may "consider only 'the facts available to the officer at the moment of the seizure or the search.'" *United States v. Odum,* 72 F.3d 1279, 1284 (7th Cir.1995) (quoting *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–1881, 20 L.Ed.2d 889 (1968) (internal quotation omitted)). O'Neil did try the key in the third floor lock after his search but before he applied for a warrant for the third floor apartment.

including O'Neil, to consult about securing a warrant. However, the other officers did not agree with her, believing instead, based on the initial discussion with Pena, that they could obtain Pena's consent and thereby obviate the delay and effort involved in preparing an affidavit for the warrant. The apparent consensus was to attempt first to get Pena's consent and, failing that, apply for a warrant if necessary.

O'Neil then returned to the third floor joined by Agent Mastrocola, who has limited training and proficiency in Spanish. In the presence of the troopers, Mastrocola asked in Spanish whether they could search his apartment, and Pena gave an answer that Mastrocola roughly translated as "go ahead." Agent Mastrocola's own Spanish was not fluent; when later listening to Pena converse in Spanish, he could understand only every seventh or eighth word.

Because of the officers' continued concern about the validity of Pena's consent, they summoned Officer Helder Peixoto of the Lawrence police department to the scene. Although Officer Peixoto had no involvement with the investigation and search until this point, he speaks Spanish fluently and was called in to communicate with Pena.

At some point after Peixoto's arrival, the officers provided Pena with a printed "consent to search form" for him to review and sign. The pre-printed form states that an undersigned person has been informed of his or her right to refuse to consent to a warrantless search of his or her living quarters, automobile, or other property and voluntarily consents to the search without threats or promises of any kind. Blank spaces are provided for filling in information particular to the person whose property is to be searched. This form was presented to Pena printed in English with the requisite blanks filled in by Officer Peixoto stating that Pena had authorized Trooper O'Neil and the other officers to search his apartment.[3]

Although Officer Peixoto advised Pena of his *Miranda* rights in both Spanish and English, he did not verbally translate the English consent form into Spanish nor did he otherwise verbally inform Pena of his right to withhold consent. Instead, Officer Peixoto simply asked Pena if he would consent to a search of the apartment, and Pena answered, "Go ahead, just don't tear anything up." Pena refused, however, to sign the consent form. Officer Peixoto indicated on the consent form that Pena had verbally consented to the search of the apartment. Officer Peixoto, Troopers O'Neil and Kew, and Agent Mastrocola signed the form as witnesses.

### 2. The Second Search

The officers then conducted a thorough search of the third floor apartment. During the search, Pena sat in his living room and watched a baseball game on television. At no time was he handcuffed or otherwise physically restrained, but he still was not free to leave.[4] Towards the end of the search, the officers pulled Pena's refrigerator away from the kitchen wall and found a hidden compartment containing a package wrapped in tape and a plastic bag containing

---

**3.** Officers Peixoto and O'Neil recalled that the flip-side of the form handed to Pena contained the same information printed in Spanish. Unfortunately, only a photocopy of the English side was presented to the Court; the government has not found or produced the original despite having over a month to do so over the pendency of this proceeding. Agent Mastrocola, whose careful testimony this Court found to be extremely credible, testified that he could not recall whether the form also was printed in Spanish. Given this equivocal testimony and that the government has failed to produce the original, the Court finds that the actual form handed to Pena was most likely in English only. This finding is consistent with the government's burden of proving voluntary consent to a warrantless search and serves the deterrent purpose of the Fourth Amendment

exclusionary rule. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973) (prosecution bears burden of proving consent to warrantless search). In any event, even if a Spanish side of the form had been presented to Pena, Officer Peixoto testified that Pena gave both the English and Spanish sides only a brief glance for under a minute. Based on this testimony, even if Pena cursorily scanned the Spanish side of the form, the Court concludes it is unlikely he understood or digested its contents.

**4.** All of the officers testified that Pena was not under formal arrest but his status was like that of an investigatory stop. Had he attempted to exit, he would have been detained.

a white powdery substance. Pena then was formally placed under arrest. Although the police initially suspected that the substance was heroin, it was later determined that the package contained more than 500 grams of cocaine. At some point after the "consent" search, Trooper O'Neil tried the keys seized from Ojeda's apartment in Pena's door and found a match.

### 3. The Third Search

When the cocaine was discovered, the search was suspended, and in what the government calls "an abundance of caution," the police then obtained a search warrant for the third floor apartment. Prepared by Agent Mersky and signed by Trooper O'Neil, the affidavit appended to the warrant application recited information provided prior to the search of the third floor, including the confidential informant's account of the controlled buy, the Lawrence police detective's tip, and Ojeda's statements about guarding the drugs for Pena. In addition, the affidavit contained information regarding the cocaine wrapper and drugs that had been discovered after the third-floor "consent" search.

The affidavit also included an error as to the sequence of events. According to the affidavit, Ojeda's statements preceded O'Neil's protective sweep. In reality, the events happened in reverse order. Trooper O'Neil conducted the protective sweep and brought Pena downstairs where Ojeda denied knowing him; Pena then was returned to his apartment. Only afterwards did Ojeda implicate Pena in illicit drug trafficking.

As a final wrinkle, the officers wrongly identified the substance seized in Pena's apartment as heroin rather than cocaine in their application for the search warrant. The officers believed the substance to have

been heroin because of the manner in which it was wrapped. As a result, the affidavit requested a warrant for heroin, although there was no heroin found in Pena's apartment.

Including the sequential error, the mistaken description of heroin, and the information gleaned from the "consent" search, the affidavit was presented to the magistrate who issued a warrant for heroin for the third floor.[5]

Even later that evening pursuant to the warrant, a third search was conducted of the apartment that resulted in the seizure of the drugs as well as various documents, including proof of Pena's residence, a photograph of Pena and Ojeda, and a key ring including keys to both the second and third floor apartments. No weapons were found in the third floor apartment.

Subsequently, Ojeda and Pena were indicted by a grand jury for possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Both Ojeda and Pena initially entered pleas of not guilty, but Ojeda changed his plea to guilty on December 11, 1995.

### III. *Discussion*

Pena moves to suppress the evidence (i.e., the cocaine wrapper and the cocaine) seized from his apartment claiming that it was obtained in violation of the Fourth Amendment. Specifically, he argues that the first search of his apartment—the "protective sweep" that uncovered the cocaine wrapper in plain view on the waste basket—was invalid. He further contends that he did not voluntarily consent to the subsequent search of his apartment, given his limited understanding of English and the coercive circumstances under which the alleged consent was given.

---

**5.** Agent Mersky testified that she became aware of the error at some time after the final search but that she failed to notify the prosecutors or this Court because she did not consider it to have been material. The Court noticed the error and *sua sponte* called a second evidentiary hearing to ascertain the correct chronology and to determine whether the officers intentionally or recklessly attempted to mislead the magistrate. *See Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Having prepared the affidavit late in the evening, the officers testified that they did not notice or appreciate their error until after the warrant application had been submitted. While Mersky and O'Neil were negligent in the preparation of the affidavit, I find that the conduct was not intentionally or recklessly misleading. In making this determination, the Court relies on the demeanor of the witnesses at the second hearing. Also, because there was little likelihood that the sequence of the Ojeda statements would have affected the magistrate judge's probable cause determination, there was no motive to lie or mislead.

Finally, he argues that the third-floor search warrant, obtained with information "tainted" by the prior illegal searches, was invalid. Consequently, Pena claims, the wrapper and the cocaine both must be excluded either as tainted by the invalid sweep or as the product of a warrantless search conducted without consent or exigent circumstances that would justify the intrusion. The government maintains that the protective sweep, the consent search, and the third floor warrant all were valid. The Court addresses these issues seriatim.

### A. *The Buie "Protective Sweep"*

The Fourth Amendment provides:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const.Amend. IV. "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980) (internal quotation marks omitted); *McCabe v. Life–Line Ambulance Serv., Inc.*, 77 F.3d 540, 544 (1st Cir.1996); *United States v. Tibolt*, 72 F.3d 965, 968 (1st Cir.1995). There are only a "few specifically established and well-delineated exceptions" to this rule, *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973), among which is the "protective sweep" held permissible in *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990).

There, the Court held that the Fourth Amendment permits an officer to conduct "a quick and limited search of premises, incident to an arrest" to determine whether additional persons hidden there pose a threat to the officers or others on the scene. *Id.* at 327, 110 S.Ct. at 1094. The protective sweep must be based on an officer's reasonable suspicion, defined as "a reasonable belief based on specific and artic-ulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others." *Id.* (quoting *Michigan v. Long*, 463 U.S. 1032, 1049–50, 103 S.Ct. 3469, 3481, 77 L.Ed.2d 1201 (1983); *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968)) (internal quotation marks and brackets omitted). Reasonable suspicion is based on the totality of the circumstances known to the officer at the time of the search and must be "something more than an inchoate and unparticularized suspicion or 'hunch.'" *United States v. Sokolow*, 490 U.S. 1, 7–8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989). Evidence discovered in plain view during a valid protective sweep is admissible. *Buie*, 494 U.S. at 330, 110 S.Ct. at 1096.

In *Buie*, the defendant was arrested after the police had entered his home, and the protective sweep followed immediately afterwards. The Court there relied extensively on the fact that the police already held a valid arrest warrant permitting them to enter Buie's home lawfully and search in every place he may have been found. *Id.* at 330 & 334 n. 1, 110 S.Ct. at 1096 & 1098 n. 1. It was only a small additional step to permit a limited post-arrest protective sweep to determine whether additional persons hidden there posed a threat to the police.

The present case does not involve a residential search incident to an arrest or search warrant already authorizing the police to enter. The officers did not have an arrest warrant for Pena, or a search warrant to enter his apartment, and therefore had no independent legal basis for entering without his consent. The government contends, however, that recent cases have gradually expanded the scope of permissible protective sweeps, and, in keeping with this trend, the Court should validate the search presented here.

Although the First Circuit has held that *Buie* applies to a protective sweep made in conjunction with a search warrant as well as an arrest, *see United States v. Daoust*, 916 F.2d 757, 759 (1st Cir.1990), no court has extended the rule to permit a warrantless

search of a residence incident to a search warrant for a different location. The government conceded as much at the hearing. Cases that permit a protective sweep of a person's premises when he is arrested outside the home are inapposite. *See, e.g., United States v. Biggs,* 70 F.3d 913, 915–16 (6th Cir.1995) (protective sweep of arrestee's motel room located 20–75 feet from arrest site valid when police knew that person whom arrestee was to have met may have been hidden within), *cert. denied,* — U.S. —, 116 S.Ct. 971, 133 L.Ed.2d 891 (1996); *United States v. Oguns,* 921 F.2d 442, 446–47 (2d Cir.1990) (protective sweep valid when police arrest defendant outside of two family house, door to defendant's apartment was left open, and there was reasonable suspicion that other persons were inside apartment); *United States v. Gerry,* 845 F.2d 34, 36–37 (1st Cir. 1988) (post-arrest protective sweep of arrestee's trailer home valid when officer heard noises within and car belonging to other suspect in drug operation was parked outside). In each of these cases, the police searched the arrestee's premises only.

It is beyond peradventure that "at the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Payton,* 445 U.S. at 589–90, 100 S.Ct. at 1382 (internal quotation marks, brackets, and citation omitted). Indeed, time and again the Supreme Court and lower courts have reaffirmed the basic principle that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *New York v. Harris,* 495 U.S. 14, 18, 110 S.Ct. 1640, 1643, 109 L.Ed.2d 13 (1990) (quoting *Payton,* 445 U.S. at 585, 100 S.Ct. at 1379–80); *see also United States v. United States District Court, Eastern District of Michigan,* 407 U.S. 297, 313, 92 S.Ct. 2125, 2134–35, 32 L.Ed.2d 752 (1972); *McCabe,* 77 F.3d at 544 (presumption of unreasonableness attached to warrantless searches "safeguard[s] the special privacy expectations traditionally recognized in the American home"); *United States v. Curzi,* 867 F.2d 36, 41 (1st Cir. 1989).

Given the Fourth Amendment's focus on protecting the sanctity of the home, the Court concludes that *Buie* does not authorize the search of a third person's residence under these circumstances. The sweep of Pena's apartment was not undertaken incident to his lawful arrest or a search warrant for his apartment. Rather, the sweep purportedly was based upon a reasonable suspicion arising out of the search of the second floor apartment.

Concededly, the officers had a reasonable suspicion to believe that the person who fled from the second floor to the third floor had been involved in illegal narcotics offenses, based on Trooper O'Neil's observations, the drugs discovered on the second floor, and informant information that the second and third floors were involved in a joint drug operation. At most, however, this information would have enabled the police to make a *Terry* -stop of the person who fled the second floor had they chosen immediately to pursue him, before he reached the threshold of the third floor apartment. *See United States v. McCarthy,* 77 F.3d 522, 529 (1st Cir.1996) ("[I]t is well-settled that, based merely on a reasonable and articulable suspicion, a police officer may make a brief stop or 'seizure' of an individual to investigate suspected past or present criminal activity.") (citing *Terry* and *United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985)).

The information recited above did not amount to probable cause to arrest Pena, however, and the police did not place him under arrest until well after the protective sweep. Therefore, the sweep of Pena's apartment was totally unlike that in *Buie.* Moreover, there was no evidence to support a reasonable belief, based on the facts, that Pena's apartment harbored other individuals posing a danger to the police. Once Pena answered the police's knock on his door, the officers had no reason to believe additional persons were hidden within. Only one person, who may or may not have been Pena, was observed fleeing from the second floor, and there was no additional evidence, such as noises from within the apartment, to suggest that other persons were concealed there. In addition, by waiting at least fifteen minutes

to proceed to the third floor, the police signified that they did not consider an attack from that area to be an immediate threat.

In addition, both pre- and post-*Buie* caselaw have invalidated "protective sweeps" on facts similar to those presented here. *See Curzi*, 867 F.2d at 39–41 (holding that arrest warrant for person hiding within third person's home does not permit police to make protective sweep once arrest is made outside that home); *see also United States v. Akrawi*, 920 F.2d 418, 421 (6th Cir.1990) (holding protective sweep of second floor of two-story house was unreasonable when police arrested person for whom arrest warrant obtained when he answered front door, sweep took place at some point within 45 minutes after arrest, and no basis for believing dangerous persons on second floor); *United States v. Owens*, 782 F.2d 146, 151 (10th Cir.1986) (once police arrest person in hallway outside his hotel room and retreat to safe area, justification for protective sweep evaporates).

## B. *Lack of Probable Cause and Exigent Circumstances*

■■■ Alternatively, the government maintains that probable cause and exigent circumstances justified the initial warrantless search of Pena's apartment, regardless of whether the protective sweep was valid. "To cross the apartment's threshold, [Trooper O'Neil] needed (1) probable cause to believe that contraband or evidence would be found inside, and (2) exigent circumstances justifying an exception to the warrant requirement, allowing him to enter without first obtaining a warrant." *United States v. Wilson*, 36 F.3d 205, 208 (1st Cir.1994). With respect to the first requirement, "[p]robable cause will be found to have been present if the officers at the scene collectively possessed reasonably trustworthy information sufficient to warrant a prudent policeman in believing that a criminal offense had been or was being committed." *Tibolt*, 72 F.3d at 969.

■■■ With respect to the second element, "[e]xigent circumstances exist where law enforcement officers confront a compelling necessity for immediate action that would not brook the delay of obtaining a warrant." *Id.* (quoting *Wilson*, 36 F.3d at 209) (internal quotation marks omitted). "The 'exigent circumstances' inquiry is limited to the objective facts reasonably known to, or discoverable by, the officers at the time of the search." *Id.* There are generally four "types of 'exigent circumstances': (1) 'hot pursuit' of a felon into a residence; (2) imminent destruction of evidence within the residence; (3) a threatened and potentially successful escape by a suspect from inside the residence; or (4) an imminent threat to the life or safety of members of the public, the police officers, or a person located within the residence." *McCabe*, 77 F.3d at 545.

■■■ The government claims that once the police discovered drugs in the second floor apartment they had probable cause to believe that the person who fled that apartment for the third floor had committed a crime. Moreover, they claim that the threatened destruction of evidence inside Pena's apartment before a warrant could be obtained amounted to exigent circumstances.

This argument fails on both counts. Before the protective sweep and Ojeda's statements linking the second and third floors, there was no probable cause to believe that whoever fled the second floor was guilty of a crime. The drugs found on the second floor were discovered hidden in a secret compartment under the kitchen sink, and the person who fled was never seen holding drugs or other evidence. He simply may have been a visitor who was startled into flight by execution of the no-knock warrant. *Cf. Wong Sun v. United States*, 371 U.S. 471, 482–84, 83 S.Ct. 407, 414–16, 9 L.Ed.2d 441 (1963) (holding that flight of suspect after unannounced, warrantless police entry into suspect's home does not create probable cause to arrest).

Again, the police had reasonable suspicion to make an investigatory stop of this person had they immediately pursued him, but they lacked probable cause to believe that he was involved in the second floor drug operation. They also did not have probable cause to arrest Pena or to believe that a crime was being committed in his apartment. Trooper O'Neil did not directly observe the person who fled the second floor entering Pena's

apartment, nor did he or anyone else, identify him as Pena. Although the confidential informant and the Lawrence police tip implicated the third floor in drug trafficking, the Court believes that, prior to Ojeda's statements confirming the second and third floor link, this information fell short of probable cause.

 Second, even if probable cause existed, the police waited at least fifteen minutes to conduct the search. By that time the pursuit was tepid, any evidence which was going to be destroyed would have been destroyed, and any escape by a suspect likely accomplished. Any exigent circumstances had evaporated. Therefore, the protective sweep was neither supported by probable cause nor exigent circumstances.

## C. *The Consent Search*

 Having determined that the protective sweep of Pena's apartment violated the Fourth Amendment, the Court now must decide whether any evidence subsequently obtained should be excluded as "fruit of the poisonous tree." *Wong Sun,* 371 U.S. at 487–88, 83 S.Ct. at 417–18. The government argues that Pena voluntarily consented to a second search of his apartment and thereby purged any taint from the prior unconstitutional search. It was during this second search that the large stash of cocaine was discovered.[6] Pena argues that he did not voluntarily consent to the search, particularly given the coercive atmosphere in which the consent was given and his inability to comprehend English.

 A consensual search is excepted from the Fourth Amendment warrant requirement. *United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct. 1870, 1878–79, 64 L.Ed.2d 497 (1980); *Schneckloth,* 412 U.S. at 219, 93 S.Ct. at 2043–44. "In a search such as this one, where the consenting party is not in custody and the government attempts to justify a warrantless search on the basis of consent, the Fourth and Fourteenth Amendments of the Constitution clearly require that the consent be freely given and is not the result of duress or coercion either express or implied." *United States v. Twomey,* 884 F.2d 46, 50–51 (1st Cir.1989), *cert. denied,* 496 U.S. 908, 110 S.Ct. 2592, 110 L.Ed.2d 273 (1990).

 "The voluntariness of a consent to search turns on the totality of the circumstances." *United States v. Barnett,* 989 F.2d 546, 555 (1st Cir.), *cert. denied,* 510 U.S. 850, 114 S.Ct. 148, 126 L.Ed.2d 110 (1993); *see also Schneckloth,* 412 U.S. at 226, 93 S.Ct. at 2047. These circumstances include the consenting party's age, intelligence, education, experience, and knowledge of the right to withhold consent. *Schneckloth,* 412 U.S. at 226, 93 S.Ct. at 2047; *Barnett,* 989 F.2d at 555. In addition, the Court must consider "evidence of inherently coercive tactics, either in the nature of police questioning or in the environment in which the questioning took place." *Twomey,* 884 F.2d at 51 (citing *Schneckloth,* 412 U.S. at 227, 93 S.Ct. at 2047–48). "Consent must be a product of [the] individual's free and unconstrained choice, rather than a mere acquiescence to a show of authority." *United States v. Wilson,* 11 F.3d 346, 351 (2d Cir.1993) (citation omitted), *cert. denied,* —— U.S. ——, 114 S.Ct. 2142, 128 L.Ed.2d 870 (1994).

 Because Pena's alleged consent followed close after an illegal search, the *Wong Sun* attenuation analysis also must be applied to determine whether Pena's purported consent was tainted by the initial illegal search. "When a consensual search is preceded by a Fourth Amendment violation, as in this case, the government must prove not only the voluntariness of the consent under the totality of the circumstances, but the government must also establish a break in the causal connection between the illegality and the evidence thereby obtained." *United States v. Melendez–Garcia,* 28 F.3d 1046, 1053 (10th Cir.1994); *McGann v. Northeast Illinois Regional Commuter R.R. Corp.,* 8 F.3d 1174, 1184 (7th Cir.1993) ("Consent ob-

---

**6.** The Court notes that if the second search was valid, the cocaine wrapper that was in plain view is admissible because the consent search was an "independent source" for its discovery. *See*

*Murray v. United States,* 487 U.S. 533, 537–38, 108 S.Ct. 2529, 2533–34, 101 L.Ed.2d 472 (1988).

tained after an illegal [search or] seizure is invalid unless it can be shown that the consent was in fact 'sufficiently an act of free will to purge the primary taint' of the unlawful [search or] seizure.") (quoting *Wong Sun*, 371 U.S. at 486, 83 S.Ct. at 416–17); *see also Florida v. Royer*, 460 U.S. 491, 507–08, 103 S.Ct. 1319, 1329–30, 75 L.Ed.2d 229 (1983) (holding that consent to search given while person in unlawful police custody is invalid) (plurality opinion); *Brown v. Illinois*, 422 U.S. 590, 602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975) (excluding confession given to police after illegal arrest).

■ The question of whether Pena's consent was voluntary in fact is therefore only a threshold inquiry before proceeding to the *Wong Sun* analysis. *See Brown*, 422 U.S. at 602, 95 S.Ct. at 2261; *United States v. King*, 990 F.2d 1552, 1564 (10th Cir.1993); *United States v. Delgadillo–Velasquez*, 856 F.2d 1292, 1299–1300 (9th Cir.1988). Although one court has held that a consent that is voluntary in fact is in itself an intervening act that purges any taint from prior police illegality, *see United States v. Carson*, 793 F.2d 1141, 1150 (10th Cir.), *cert. denied*, 479 U.S. 914, 107 S.Ct. 315, 93 L.Ed.2d 289 (1986), the majority view is that both voluntariness in fact and a break in the causal chain must be shown to render evidence obtained after an illegal search admissible. *See Melendez–Garcia*, 28 F.3d at 1054 (rejecting *Carson*); *United States v. Chavez–Villarreal*, 3 F.3d 124, 127 (5th Cir.1993) ("Even though voluntarily given, consent does not remove the taint of an illegal detention if it is the product of that detention and not an independent act of free will."); *United States v. Campbell*, 920 F.2d 793, 797 (11th Cir.1991) (holding evidence must be suppressed as fruit of illegal arrest unless consent both voluntary and not product of illegal detention); *Delgadillo–Velasquez*, 856 F.2d at 1299 ("The mere fact that consent to search is voluntary within the meaning of [*Schneckloth* ] does not mean that it is untainted by a prior illegal arrest."); *see also* 3 Wayne R. LaFave, *Search and Seizure* § 8.2(d) at 190 (2d ed. 1987) (noting difference between voluntariness and attenuation tests).

■ In determining whether a consent was vitiated by the taint of the prior illegal search, the Court must consider several factors, including the "temporal proximity" of the Fourth Amendment violation and the consent, the presence of intervening circumstances, and the "purpose and flagrancy of the official misconduct." *Brown*, 422 U.S. at 604, 95 S.Ct. at 2262; *Chavez–Villarreal*, 3 F.3d at 128; *see also United States v. McSwain*, 29 F.3d 558, 562–63 (10th Cir. 1994) (holding consensual search of vehicle invalid after investigatory stop made without reasonable suspicion after applying *Brown* factors); *United States v. Bradley*, 922 F.2d 1290, 1296 (6th Cir.1991) (holding consent to search following invalid arrest was tainted even though *Miranda* warnings given); *Campbell*, 920 F.2d at 797–98 (holding consent to search given after illegal arrest invalid because no intervening circumstances between arrest and consent cured taint of illegal arrest).

The threshold question of whether Pena voluntarily consented to the search of his apartment is a close one. Trooper O'Neil, Agent Mastrocola, and Officer Peixoto all asked Pena for permission to search his apartment and all testified that they believed they received unequivocal verbal consent. Pena neither speaks nor understands English except in a very rudimentary fashion, however, and O'Neil does not speak Spanish and Mastrocola has only limited Spanish language skills. Pena's answers to their requests to search, which were something to the effect of "look, look, no problemo, no destructo," were hardly unambiguous. Officer Peixoto's request for consent presents a different situation. In a conversation conducted completely in Spanish, Peixoto advised Pena of his *Miranda* rights and then requested and obtained consent to search. Based primarily on Peixoto's testimony, the Court finds that Pena verbally consented to the search.

The Court still must determine whether, considering the *Schneckloth* factors, Pena's consent was voluntary under the totality of the circumstances. According to his pretrial services report, Pena is a thirty-year old native of Puerto Rico, has an eighth-grade

education, and has no criminal record.[7] At most, he has only limited English skills. Moreover, when Pena was asked to consent to search, he was surrounded by several armed police officers, one of whom had only minutes before entered his apartment uninvited to conduct a sweep of his home. Before requesting consent, Trooper O'Neil also called Pena's attention to the cocaine wrapper, which was found and seized after an illegal search, thereby adding to an inherently coercive atmosphere.

Under these circumstances, the Court is not persuaded that Pena's initial consent was voluntarily given. *See Wilson*, 11 F.3d at 351 (holding involuntary consent of person with limited education and knowledge of English language, who was not informed of right to withhold consent, and who had been subjected to intrusive entry into apartment minutes earlier). Cases cited by the government in which persons of limited English comprehension were held to have voluntarily consented to a search or to a waiver of other rights are inapposite; in each case the defendant either was able to communicate adequately in English or was provided with an interpreter. *See United States v. Chaidez*, 906 F.2d 377, 381 (8th Cir.1990) (consent valid in part because defendant could communicate orally in English); *United States v. Yunis*, 859 F.2d 953, 958–59 (D.C.Cir.1988) (holding that faulty rendering of Arabic translation of *Miranda* rights on pre-printed card did not vitiate consent when defendant provided with Arabic interpreter at time consent given). Here, there is no evidence that Pena can understand anything but a few words of English.

██ Although not determinative, the additional fact that Pena was never informed in Spanish of his right to withhold consent, particularly after the police had just searched his apartment without his consent, is particularly significant. *See United States v. Ward*, 961 F.2d 1526, 1532 (10th Cir.1992) (advising individual of right to refuse consent important because it shows individual that police are prepared to respect assertion of right). His answers of "look, look, no destructo, no problemo" may have signified only his desire to communicate that he would not put up any resistance coupled with a plea not to destroy his apartment. Knowledge of the right to refuse consent is only one factor to consider under the totality of the circumstances, *Schneckloth*, 412 U.S. at 248–49, 93 S.Ct. at 2058–59, but in a case in which the police unlawfully intruded into the home shortly before requesting consent, it militates strongly against a finding of voluntariness.

The Court recognizes that there are factors on which a finding of voluntariness could be justified with respect to the verbal consent given in response to Mastrocola's and Peixoto's inquiry. Aside from the first invalid "protective sweep," the police did not conduct any further search without Pena's permission nor did they physically restrain him or threaten him. In this sense, the Court does not hold that Pena's will was "overborne, in the sense of his having suffered a critically impaired capacity for self-determination." *United States v. Wilkinson*, 926 F.2d 22, 25 (1st Cir.), *cert. denied*, 501 U.S. 1211, 111 S.Ct. 2813, 115 L.Ed.2d 985 (1991). Nor did the police coerce Pena's consent by "improperly placing before him an impermissible choice; they did not, for example, threaten him with a gun in order to elicit an otherwise 'voluntary' consent." *Id.* (holding consent to search valid when defendant who was houseguest informed police where he had hidden drugs and firearms in friend's home to prevent police from "tear[ing] the place apart" in searching for contraband).

On balance, however, the Court finds that the government has not proven by a preponderance of the evidence that Pena's consent was "the product of an essentially free and unconstrained choice." *Schneckloth*, 412 U.S. at 225, 93 S.Ct. at 2047 (citation and internal quotation marks omitted). The Court's decision takes account of the Supreme Court's dual admonitions that "to ap-

---

7. According to his pretrial services report, Pena's record consists only of pending state court charges arising out of the same incident giving rise to the present motion to suppress. The pretrial services report also attributes to Pena the arrest record of one Jose Manuel Allende, but the government conceded at the detention hearing before Magistrate Judge Alexander that this was in error.

prove [consent] searches without the most careful scrutiny would sanction the possibility of official coercion" and that "constitutional provisions for the security of person and property should be liberally construed" to prevent "stealthy encroachments" upon constitutional rights. *Id.* at 228–29, 93 S.Ct. at 2048 (quoting *Boyd v. United States*, 116 U.S. 616, 635, 6 S.Ct. 524, 534–35, 29 L.Ed. 746 (1886)). This is a close case, but the scales tip towards the Defendant because of the following factors: (1) all the verbal consents occurred within an hour after an illegal protective sweep; (2) Pena refused to sign a written form; (3) no police officer verbally informed Pena of his right to refuse consent; (4) Pena was not free to leave and was surrounded by several fully armed police officers who escorted him up and down stairs; (5) Pena's lack of prior involvement with the criminal system; (6) Pena's palpable fear of having his apartment destroyed; and (7) Pena's poor English.

■ Having held that Pena's consent to search was not voluntary, the Court need not dwell on the *Wong Sun* attenuation analysis. Suffice it to say that given the fact that the invalid protective sweep was followed within a matter of minutes by Pena's consent to search, it is doubtful that Pena's consent, even if voluntary, was purged of the taint of the prior unlawful search.

Although Pena was read his *Miranda* rights and there was no flagrant police misconduct, the protective sweep and the consent were in close temporal proximity and there were no intervening circumstances to attenuate the taint of the illegal search. *See Brown*, 422 U.S. at 604, 95 S.Ct. at 2262 (confession given less than two hours after illegal arrest, without any intervening circumstances, was tainted); *McSwain*, 29 F.3d at 563 (consent given only minutes after illegal detention and questioning was tainted); *Campbell*, 920 F.2d at 798 (consent tainted by illegal arrest occurring two and one half hours earlier); *United States v. Maez*, 872 F.2d 1444, 1455–56 (10th Cir.1989) (holding consent obtained thirty minutes after illegal

arrest tainted); *Delgadillo–Velasquez*, 856 F.2d at 1300 (consent given after *Miranda* warnings but within minutes of illegal arrest remains tainted); *United States v. Thompson*, 712 F.2d 1356, 1362 (11th Cir.1983) (consent given immediately after arrest and without intervening circumstances invalid, although there was no flagrant police misconduct). The record and hearings did not disclose exactly how much time elapsed between the protective sweep and Pena's consent, but the two events occurred within the same "brief, continuous encounter" between Pena and the police. *United States v. Gooding*, 695 F.2d 78, 84 (4th Cir.1982). Moreover, Trooper O'Neil "exploited the illegality" of the protective sweep by drawing Pena's attention to the cocaine wrapper found during the unlawful search when asking his consent. *Wong Sun*, 371 U.S. at 486–88, 83 S.Ct. at 416–17.

■ These circumstances do not indicate that Pena's consent, even if voluntary, was "sufficiently an act of free will" to purge the taint of the unlawful sweep. *Id.* at 486, 83 S.Ct. at 416; *Brown*, 422 U.S. at 598–600, 95 S.Ct. at 2259–60. The government bears the burden of proof on this question, *Taylor v. Alabama*, 457 U.S. 687, 690, 102 S.Ct. 2664, 2667, 73 L.Ed.2d 314 (1982); *Oguns*, 921 F.2d at 447, and has not satisfied it.

#### D. *The Third Floor Warrant*

■ Having found that both the protective sweep and the consent search were constitutionally infirm, the Court proceeds to the final question: whether the third-floor search warrant, obtained after the cocaine and wrapper were discovered, was an "independent source" of the evidence justifying its admissibility. The "independent source" doctrine "applies [ ] to evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality." *Murray v. United States*, 487 U.S. 533, 537, 108 S.Ct. 2529, 2533, 101 L.Ed.2d 472 (1988).[8] If the third-floor war-

---

**8.** The "independent source" and "inevitable discovery" doctrines are similar but should not be confused here. In the former, evidence that is

come at lawfully from a source independent of the taint of illegal conduct is deemed admissible. Under the latter, evidence that is discovered

rant was "genuinely independent" of the prior illegal searches, the cocaine and the wrapper should not be suppressed. *Id.* at 543, 108 S.Ct. at 2536.

In *Murray,* government officers obtained a search warrant for a warehouse after they already had entered it and therein observed bales of what they suspected was marijuana. *Id.* at 535–36, 108 S.Ct. at 2532–33. The warrant application did not disclose what had been seen during the prior illegal search of the warehouse. *Id.* at 536, 108 S.Ct. at 2532–33. Rather than announcing a *per se* rule excluding evidence discovered under such circumstances, the Court held that "information which is received through an illegal source is considered to be cleanly obtained when it arrives through an independent source." *Id.* at 538–39, 108 S.Ct. at 2534 (quoting *United States v. Silvestri,* 787 F.2d 736, 739 (1st Cir.1986), *cert. denied,* 487 U.S. 1233, 108 S.Ct. 2897, 101 L.Ed.2d 931 (1988)). Based "upon the policy that, while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied [but for the illegal activity]," *id.* 487 U.S. at 542, 108 S.Ct. at 2535, the Court remanded to determine whether "the agents would have sought a warrant if they had not earlier entered the warehouse." *Id.* at 543, 108 S.Ct. at 2536.

At this juncture in these proceedings, therefore, the Court must determine "whether the search pursuant to warrant was in fact a genuinely independent source.... This would not be the case if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his [or her] decision to issue the warrant." *Id.* at 542, 108 S.Ct. at 2536.

■ In practice, this inquiry involves a two-part test. For evidence to remain admissible after execution of a search warrant based, in part, on a prior illegal search, "(1)

the warrant must be supported by probable cause derived from sources independent of the illegal entry; and (2) the decision to seek the warrant may not be prompted by information gleaned from the illegal conduct." *United States v. Johnson,* 994 F.2d 980, 987 (2d Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 418, 126 L.Ed.2d 364 (1993); *see also United States v. Hill,* 55 F.3d 479, 480–81 (9th Cir.1995) (per curiam) (employing two-part inquiry and remanding for determination on second-part "motivation" test); *United States v. Markling,* 7 F.3d 1309, 1315–18 (7th Cir.1993) (applying same); *United States v. Restrepo,* 966 F.2d 964, 968–72 (5th Cir.1992) (same), *cert. denied sub nom., Pulido v. United States,* 506 U.S. 1049, 113 S.Ct. 968, 122 L.Ed.2d 124 (1993); *United States v. Herrold,* 962 F.2d 1131, 1144 (3d Cir.), *cert. denied,* 506 U.S. 958, 113 S.Ct. 421, 121 L.Ed.2d 344 (1992); *United States v. Halliman,* 923 F.2d 873, 880–81 (D.C.Cir.1991); *cf. United States v. Beltran,* 917 F.2d 641, 644 (1st Cir.1990) (Breyer, C.J.) (suggesting in *dicta* that "a warrant that rests upon information obtained through an unlawful arrest is invalid unless the government shows not only that it had enough lawfully obtained information to justify the warrant but also that it would have applied for the warrant in the absence of the unlawful arrest") (citing *Murray,* 487 U.S. at 542, 108 S.Ct. at 2535–36).

■ The first part of this inquiry requires an expurgation procedure similar to that used by courts in *Franks* hearings. *See Franks v. Delaware,* 438 U.S. 154, 171–72, 98 S.Ct. 2674, 2684–85, 57 L.Ed.2d 667 (1978) (when false material is intentionally included in warrant application, warrant remains valid if other information recited in affidavit establishes probable cause). To determine whether the issuing magistrate was affected by the unlawful searches, the Court simply excises from the warrant affidavit any information "tainted" by the prior illegal search. What remains is examined to ascertain whether there was probable cause to issue the war-

through unlawful conduct, but would inevitably be discovered by other means, is rendered admissible. Indeed, the "inevitable discovery doctrine ... is in reality an extrapolation from the independent source doctrine." *Murray,* 487 U.S. at

539, 108 S.Ct. at 2534; *see also United States v. Herrold,* 962 F.2d 1131, 1138–40 (3d Cir.) (contrasting independent source and inevitable discovery doctrines), *cert. denied,* 506 U.S. 958, 113 S.Ct. 421, 121 L.Ed.2d 344 (1992).

rant independent of the prior illegal searches. *See United States v. Ford,* 22 F.3d 374, 379 (1st Cir.) (employing *Franks* expurgation methodology), *cert. denied,* —— U.S. ——, 115 S.Ct. 257, 130 L.Ed.2d 177 (1994); *Markling,* 7 F.3d at 1315–16; *Restrepo,* 966 F.2d at 968–971; *Herrold,* 962 F.2d at 1141–42.

■ Here, this task is easily accomplished by deleting from Trooper O'Neil's affidavit all information obtained during the protective sweep and consent search. The remainder of the affidavit recites the following: (1) the confidential informant's account of an unidentified person's appearance at the second-floor controlled buy apparently from "upstairs;" (2) the tip supplied from the Lawrence police detective, via his own informant, that the second and third floors were involved in a joint drug trafficking operation; (3) O'Neil's observation of a male fleeing the second floor upstairs during execution of the "no-knock" warrant; and (4) Ojeda's statements that the drugs found on the second floor actually belonged to the third-floor occupant and that additional drugs would be found there.

■ If Ojeda's statements also were tainted in some manner by the illegal searches, then there would not be probable cause to obtain the warrant. For several reasons, however, the Court finds that Ojeda's statements were not tainted and thus were properly presented in the warrant application. There is no evidence Ojeda knew about the protective sweep or the drug wrapper discovered during the sweep. Ojeda volunteered the statements rather than respond to police questioning about the third floor. A tougher question is whether the statements were tainted by the police officers' *Terry*-type seizure of Pena after the protective sweep. There is a strong argument that the police illegally escorted Pena from his home to the second floor to stage the encounter with Ojeda. *Terry* does not authorize police to enter a suspect's home, seize him, and require him to exit, all based on reasonable suspicion. *Cf. Hayes v. Florida,* 470 U.S. 811, 816, 105 S.Ct. 1643, 1646–47, 84 L.Ed.2d 705 (1985) (holding that police may not remove person from home and bring to station-house for fingerprinting based on "reasonable suspicion" alone).

Assuming this seizure of Pena was illegal, the Court nonetheless decides that Ojeda's statements were not tainted. Although only a short time elapsed between Pena's seizure and Ojeda's statements, there is no evidence of a causal link between the two warranting exclusion of the latter under *Wong Sun.* This is because a witness's live testimony is treated differently under the *Wong Sun* attenuation analysis. "Witnesses can, and often do, come forward and offer evidence entirely of their own volition." *United States v. Ceccolini,* 435 U.S. 268, 276, 98 S.Ct. 1054, 1060, 55 L.Ed.2d 268 (1978). "In determining whether a significant attenuation between police misconduct and live-witness testimony exists, the court must assess the effect of the search on the exercise of the witness' free will." *United States v. Hooton,* 662 F.2d 628, 632 (9th Cir.1981), *cert. denied,* 455 U.S. 1004, 102 S.Ct. 1640, 71 L.Ed.2d 873 (1982). Defendant has not argued that Ojeda was prompted to make his statement regarding the third floor because of police misconduct in bringing Pena downstairs. Given that Ojeda was not informed of the discovery of contraband on the third floor before making his statements and Ojeda's obvious understanding of the beneficial effects of cooperation, it is unlikely that the confrontation with Pena was the substantial motivating factor leading him to volunteer the information.

All derived from sources independent of the illegal searches, these four factors considered as a whole are sufficient to establish probable cause to believe that the third-floor occupant was engaged in criminal activity.

■ The second part of the *Murray* inquiry presents a more difficult question. The Court must determine whether the officers were prompted to seek a warrant by what they discovered during the illegal searches of Pena's apartment. In effect, the Court must "ask whether [the warrant] would have been sought even if what actually happened had not occurred.... That is to say, what counts is whether the actual illegal search had any effect in producing the war-

rant...." 487 U.S. at 542 n. 3, 108 S.Ct. at 2536 n. 3. "Thus, *Murray* instructs the trial court to determine ... whether information gleaned through the illegal search influenced or motivated the officers' decision to procure a warrant." *Restrepo,* 966 F.2d at 971. *See also* Wayne R. LaFave, *Search and Seizure* § 11.4 at 110 (Supp.1994) ("*Murray* instructs that even if the illegality unquestionably contributed not at all to the magistrate's decision to issue the warrant, the warrant is nonetheless tainted if the illegally obtained facts prompted the agents' decision to seek the warrant.") (internal quotation marks and footnote omitted).

Few cases discuss the procedure for conducting this phase of the inquiry. Courts specifically addressing the issue have attempted to put the officers in a pre-violation posture and ask whether a warrant would have been sought absent the illegal search or seizure. For example, in *Herrold,* officers arrested a suspect in his trailer based on reliable information that he was planning to leave before they had an opportunity to secure a warrant. During the arrest, the officers saw drugs and drug paraphernalia in plain view and subsequently obtained a search warrant reciting both pre- and post-arrest and search information. 962 F.2d at 1133–36. Assuming the illegality of the initial warrantless search and arrest, the court found probable cause based solely on pre-search and arrest information and further held that the police were not prompted by their initial search to procure a warrant. If the suspect had left the trailer and been arrested, the police would have sought a warrant; their decision to enter the trailer was motivated solely by their erroneous belief that they had exigent circumstances. *Id.* at 1141 & 1141 n. 9. Even absent the initial entry, the police would have obtained a warrant. *Id.*

Similarly, in *Johnson,* a civilian employee of the U.S. Navy was involved in a bitter dispute with one of his supervisors and began carrying a concealed tape recorder to gather evidence of harassment. The dispute ended when the suspect shot and severely wounded his supervisor. In a search incident to arrest, the police discovered the concealed tape recorder but did not play the tapes until six months after the incident and did so without first obtaining a warrant. After a district judge evinced concern that a search incident to arrest did not authorize playing the tapes, the government secured a warrant. 994 F.2d at 982. Holding that the police "would have applied for a warrant had they not listened to the tape beforehand," the court reasoned that the police held an honest but mistaken belief that they were entitled to listen to the tapes without a warrant. *Id.* at 987. The district court's reservations about the search, rather than listening to the tape, prompted the officers to obtain the warrant. *Id.*

This case is similar in many respects to *Herrold* and *Johnson.* On one hand, Agent Mersky's and Trooper O'Neil's uncontroverted testimony was that they obtained a warrant to "confirm" and "secure" the seizure of the cocaine and wrapper found in Pena's apartment. By their own admission, they were prompted by what they found to obtain a warrant "out of an abundance of caution." Moreover, Mersky paused prior to the consent search of Pena's apartment and suggested that a warrant be obtained. Rather than brook the delay and "hassle" of applying for a warrant, however, the officers collectively decided to elect the imprudent course of proceeding based on Pena's verbal consent.

On the other hand, the officers honestly believed that Pena consented to the search of his apartment, and procured two Spanish speaking officers to ensure that they understood his verbal response. Although the Court concluded that the consent was involuntary based on the totality of the circumstances, and therefore the resulting search was invalid, the officers were not prompted to seek a warrant by a "confirmatory search." A "confirmatory search" is one in which officers conduct an initial warrantless search to determine whether they would uncover evidence worth the trouble of obtaining a warrant. Indeed, *Murray* likely was designed to deal with the so-called "confirmatory search problem." LaFave, *supra,* § 11.4, at 110–11 (Supp.1994).

"[T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence

of a crime are properly balanced by putting the police in the same, not a worse, position than they would have been in if no police error or misconduct had occurred...." *Nix v. Williams*, 467 U.S. 431, 443, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984), *quoted in Murray*, 487 U.S. at 537, 108 S.Ct. at 2533. Following this command, the Court must consider what would have happened in this case had the police neither conducted the protective sweep nor procured Pena's consent to search. The Court finds that, based on the pre-search information coupled with Ojeda's statements implicating the third-floor apartment, the officers would have sought a warrant had consent not been obtained. Therefore, the officers were not prompted to seek a warrant by what they discovered during their illegal searches of Pena's apartment.

Despite the fact that the wrapper and cocaine were discovered during the initial illegal searches, they were "rediscovered" during the lawful search pursuant to the warrant. *See Murray*, 487 U.S. at 541–42, 108 S.Ct. at 2535–36. Because this evidence was thereby procured through an independent source, it is admissible in further judicial proceedings.

E. *The Mistaken Description of Heroin*

 As his last bone of contention, Defendant seeks to exclude the cocaine seized pursuant to the third floor warrant on the ground that the affidavit wrongly recites heroin as the object to be searched and seized. The Fourth Amendment's proscription against general exploratory searches requires warrants "particularly [to] describ[e] the place to be searched, and the persons or things to be seized." U.S. Const.Amend. IV. Nevertheless, "[l]aw enforcement agents may seize evidence in plain view during a lawful search even though the items seized are not included within the scope of the warrant." *United States v. Robles*, 45 F.3d 1, 6 (1st Cir.), *cert. denied*, ─── U.S. ───, 115 S.Ct. 1416, 131 L.Ed.2d 300 (1995); *see also Horton v. California*, 496 U.S. 128, 137–42, 110 S.Ct. 2301, 2308–11, 110 L.Ed.2d 112 (1990) (holding evidence admissible that was discovered in plain view during search for other

items recited in search warrant, even if officer conducting search was interested in discovering evidence not specifically mentioned in warrant).

 "To fall within the 'plain view' doctrine, a seizure must satisfy two criteria: first, the officers' presence at the point of discovery must be lawful, and second, the item's evidentiary value must be immediately apparent to the searchers." *Robles*, 45 F.3d at 6. This second criterion is found here with little difficulty for it was immediately apparent to the officers searching Pena's apartment that the white powder packaged in duct tape and found behind the refrigerator was a controlled substance.

In this already labyrinthine case, however, the first requirement presents yet another twist. Because the protective sweep and the consent search were illegal, the officers were not lawfully in Pena's apartment when they discovered the drugs that they suspected were heroin. Accordingly, this is not a run-of-the-mill plain view situation where an officer with a warrant for substance x comes across substance y in the course of the search. Here, the officers already conducted a search for substance x (cocaine), found what they believed to be substance y (heroin), and then sought a warrant for substance y.

Despite this variation, the Court holds the plain view doctrine to apply on the same rationale as the "independent source" rule discussed above. Had the officers not conducted the protective sweep and consent search, thereby discovering the substance they thought to be heroin, they would have applied for a warrant for cocaine. Indeed, the record makes no other reference to heroin; both the substance purchased from Ojeda during the controlled buy and the substance subsequently seized from the second floor were cocaine. Putting the police in their pre-violation posture, as it did with the *Murray* inquiry, the Court holds that the police would have sought a warrant for cocaine had they not discovered and mistakenly identified the substance to have been heroin. This holding is consistent with the policy, already outlined in detail above, of putting the police in the same position that they

**1258**

would have occupied but for the constitutional violation. *Cf. United States v. Helmel,* 769 F.2d 1306, 1321 (8th Cir.1985) (holding items "seized beyond the scope of authority granted by the warrant" admissible, because "the officer reasonably could have though that these items were related to evidence sanctioned by the warrant.").

IV. *Conclusion and Order*

Based on the foregoing, Pena's motion to suppress illegally-obtained evidence is ***DENIED.***