**UNITED STATES of America**

v.

**Robert GOODRICH**

**No. CR. 99–10387–DPW.**

United States District Court,
D. Massachusetts.

Oct. 29, 2001.

Gregory Moffatt, U.S. Attorney's, Boston, MA, for U.S.

Miriam Conrad, Federal Defender Office, Boston, MA, for Defendant.

## MEMORANDUM AND ORDER

WOODLOCK, District Judge.

Robert Goodrich moves to suppress physical evidence seized as a result of searches he argues were in violation of his Fourth Amendment rights. He contends that the warrantless "inventory search" of the car he had been driving, conducted by the Swampscott Police Department after arresting him, was an investigative effort prohibited by the Fourth Amendment. He contends further that the subsequent search—to which he formally consented—of a bag found in the trunk of the car during the inventory search, is invalid as the fruit of the earlier search.

Following an evidentiary hearing, I will grant the motion to suppress on grounds that the inventory search was impermissible and that the search of the bag was tainted by it.

## I. Findings of Fact

On September 7, 1999, Robert Goodrich was arrested at the VFW Hall in Swampscott, Massachusetts, by officers from the Swampscott Police Department acting pursuant to outstanding warrants for armed robbery. Officer Tim Cassidy[1] had surveilled the VFW Hall because Goodrich's wife worked there. After seeing Goodrich drive up, park in the VFW lot,[2] and enter

the Hall, Officer Cassidy called for other officers to assist in Goodrich's arrest. At that time, he was informed that the car Goodrich was driving belonged to Goodrich's sister. Shortly thereafter, Sergeant Cassidy and Officers Delano and Waters arrived at the VFW hall. Waters and Delano entered the VFW Hall and arrested Goodrich, while Officer Cassidy and Sergeant Cassidy attempted to enter by the side doorway, discovered that it was locked, and initially remained outside at the side doorway.

After Goodrich was apprehended, Officer Cassidy entered the VFW Hall and searched the bathroom, where he found Goodrich's jacket. Officer Cassidy searched elsewhere in the VFW Hall hoping to find the gun with which Goodrich had allegedly committed the armed robbery.

Officer Waters transported Goodrich back to the Police Station, where he was given his Miranda rights and booked. Meanwhile, Officer Cassidy and Sergeant Cassidy remained behind, obtained keys to the car, and began a search of it.

The evidence is muddled about how the officers obtained the keys to the car to gain entrance to the trunk. Sergeant Cassidy testified that he thought Goodrich's wife came outside into the parking lot and gave him the keys, perhaps on the request of the police. Officer Cassidy had no memory of how the keys were acquired.

---

1. There are two Swampscott police officers named Cassidy involved in this case who are brothers. To avoid confusion, I refer in this memorandum to Tim Cassidy as "Officer Cassidy," although he is currently an Inspector and Peter Cassidy as "Sergeant Cassidy," although he is currently a Lieutenant.

2. The VFW parking lot is owned by the Town of Swampscott but privately controlled by the

VFW pursuant to a lease with the city. There was some testimony that the city had the right (and police had the obligation) to keep clear access at the rear of the lot but I find no evidence that the car in fact blocked the city's access. Nor do I find any evidence that the city's access modified the VFW's legal control of the lot in any material way.

According to Goodrich's wife, after Goodrich was handcuffed but while he was still in the VFW Hall, she asked him for his keys, and he attempted to pass them to her, but they dropped to the floor. She testified that Sergeant Cassidy then picked them up and, upon her request, removed her house keys and gave them to her. Sergeant Cassidy testified that he believed he never entered the VFW Hall.

Given Sergeant Cassidy's memory that Mrs. Goodrich provided him with the keys, and Mrs. Goodrich's memory that Sergeant Cassidy retrieved the keys off the floor when her husband attempted to pass them to her, I find at a minimum that the police took the car keys from Mrs. Goodrich, the person to whom they knew the keys had been or were being entrusted, in order to conduct a search of the vehicle.

During the car search, Sergeant Cassidy discovered a duffel bag in the trunk. He called the station on the radio to discuss with Lieutenant Chadwell whether or not a warrant would be required to search the trunk and open the duffel bag found there.[3]

Sergeant Cassidy told Chadwell that "[t]he trunk is open, there's a bag in there that's zippered closed and I do not want to jeopardize what's in it. If you get my meaning." During that conversation, Chadwell suggested to Sergeant Cassidy that he believed that Cassidy could continue the search without a warrant pursuant to the Department's Inventory/Towing policy. Officer Waters then communicated that Goodrich, who was within hearing range of their conversation, had stated that there was a gun in the duffel bag in the trunk.[4] Lieutenant Chadwell offered some alternative theories to justify opening the bag, but concluded that Sergeant Cassidy ought to bring the bag in to be opened in the station. Sergeant Cassidy removed the duffel bag from the trunk of the car and waited for the tow truck to arrive.

During the search of the car, Sergeant Cassidy had ordered Mrs. Goodrich to stay in the VFW Hall. At some point, she was permitted to come out and was told that the car was going to be towed. She did not ask if she could take custody of the car because Sergeant Cassidy told her it was going to be towed and because she didn't know she had the right to do so while the police investigation was underway. But she did complain that she would have trouble affording the tow charge. She also asked for permission to retrieve her sister-in-law's baby-seat from the car, which was allowed. The police entrusted to her the task of informing her sister-in-law, the car's registered owner, that the vehicle had been impounded.

After the car had been towed, Sergeant and Officer Cassidy returned with the duffel bag to the station, where Goodrich gave written consent to search his property. They opened the bag and found a handgun.

## II. The Validity of the Impoundment and Subsequent Inventory Search

■ As a general proposition, and subject to a number of exceptions, police may

---

3. Sergeant Cassidy testified that during the search he found the bag and immediately felt what appeared to be a gun in it. Then he called to ask Chadwell whether they should get a warrant.

4. Waters' testimony can be read to suggest that Goodrich also gave oral permission to search at this point and that Waters communicated that permission over the radio. Sergeant Cassidy testified that he heard over the radio that he had permission to search, but conceded that the tapes reflect only that Waters told Cassidy that Goodrich said there was a gun in the bag in the trunk. I find that Goodrich did not give oral permission to search at this point.

conduct searches only pursuant to a valid warrant. The Supreme Court has held that one such exception allows police to conduct an "inventory" of the contents of a car when they validly impound the vehicle. *Colorado v. Bertine,* 479 U.S. 367, 371, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987); *South Dakota v. Opperman,* 428 U.S. 364, 367–68, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). So long as the inventory is not a pretext to disguise an impermissible evidentiary search and is conducted pursuant to reasonable standard procedures designed to serve some interest other than collecting evidence of criminal wrongdoing, it is permitted. *See Bertine,* 479 U.S. at 375, 107 S.Ct. 738; *United States v. Ramos–Morales,* 981 F.2d 625, 626 (1st Cir.1992).

In this case, the precise question is not whether an inventory search may be conducted when the police have a car towed, but the antecedent question under what circumstances the police may seize and tow the car in the first place. *See United States v. Duguay,* 93 F.3d 346, 351 (7th Cir.1996)("the decision to impound (the 'seizure') is properly analyzed as distinct from the decision to inventory (the 'search')").

■ Pursuant to their "community caretaking" function, the police have the authority to impound or tow a car that is endangering the public or is itself endangered. *See United States v. Rodriguez–Morales,* 929 F.2d 780, 785 (1st Cir.1991); *see also, South Dakota v. Opperman,* 428 U.S. 364, 368, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). The Fourth Amendment provides no direct prohibition of such a seizure, so long as the "procedure employed (and its implementation) is reasonable" and there is a "strong noninvestigatory justification" for the seizure. *Id.* The need

for a noninvestigatory purpose and reasonable procedures to justify a warrantless seizure and inventory search was reemphasized by the Supreme Court in *Bertine,* 479 U.S. at 375, 107 S.Ct. 738.

Goodrich argues that the police had no legitimate noninvestigatory purpose for removing his car because it was legally parked in a private lot and his wife could have driven it away or arranged to have it removed. A review of the caselaw supports the view that what distinguishes a permissible from an impermissible seizure of a legally parked car is whether the police had reason to believe that someone was available who could be entrusted with the car.

In *United States v. Pappas,* 735 F.2d 1232, 1234 (10th Cir.1984), the Tenth Circuit held that it was proper to suppress the fruits of the inventory search of a car towed when it was legally parked and when there was present "a young lady friend ... who, if asked, might well have been able to take the car ...." *Id.* The court acknowledged *United States v. Staller,* 616 F.2d 1284 (5th Cir.1980), which held that "[t]he fact that a car is legally parked ... does not necessarily negate the need to take the vehicle into protective custody." *Id.* at 1289–90. However, *Pappas* distinguished *Staller* on grounds that in *Staller* "the automobile's owner, who was from out of state ... had no friend or relative available to take care of his car as his only traveling companion had also been arrested." *Id.* The court further noted that "*Opperman* cannot be used to justify the automatic inventory of every car upon the arrest of its owner. The justifications for the rule are too carefully crafted for this to be the intent." *Pappas,* 735 F.2d at 1234.[5]

---

**5.** In a later case, *United States v. Kornegay,* 885 F.2d 713, 715–16 (10th Cir.1989), the

Tenth Circuit held that the seizure of a car parked legally in a parking lot was proper but

In *United States v. Zapata*, 18 F.3d 971 (1st Cir.1994), the First Circuit held that a seizure of a car parked legally in a rest area was proper. The court made note of the fact that "all the relevant criteria are satisfied" when the car would have to be impounded because it was unregistered and uninsured and so could not be lawfully driven by anyone. *Id.* at 978.

In *United States v. Duguay*, 93 F.3d 346 (7th Cir.1996), the Seventh Circuit, through a majority opinion written by Judge Skinner of this court sitting by designation, held that a policy of routinely towing cars when the driver was arrested was constitutionally infirm. The *Duguay* court may have diverged from First Circuit law when it held that protecting the car from vandalism or theft is not a constitutionally valid reason for towing. *Id.* at 352–53.[6] However, it appears to have been on common ground when it noted that "impoundment based solely on an arrestee's status as a driver, owner, or passenger is irrational and inconsistent with 'caretaking' functions [because it ignores] whether another person could have removed the car and readily eliminated any traffic congestion, parking violation, or road hazard." *Id.* at 353.

These cases suggest that as a general proposition a reasonable standard procedure for towing and impoundment may insulate an individual decision to seize a vehicle from successful constitutional challenge.[7] The cases recognize more particu-

---

continued to make the determination turn on whether someone was available to be entrusted with the car. In this connection, it distinguished *Pappas* because, among other things, the arrestee in *Kornegay* "was alone, and there was no friend, relative or companion who could be asked to care for the car." *Id.* at 716.

**6.** *See generally United States v. Rodriguez–Morales*, 929 F.2d 780, 785 (impoundment authorized when car "would have been easy prey for vandals.") *See also, United States v. Ramos–Morales*, 981 F.2d 625. In *Ramos–Morales* the First Circuit through a majority opinion written by then-Chief Judge Breyer found that a car legally parked on a quiet residential street could be impounded so long as it was done pursuant to "DEA standard procedures" which instruct agents not to leave a vehicle in an "unknown location." *Id.* at 626. The majority found that "perhaps most importantly, the Supreme Court in *Bertine* seemed specifically to hold that the Constitution permits arresting officers to impound, pursuant to standard procedures, an arrested person's automobile that might otherwise be left abandoned." *Id.* at 627.

In a vigorous dissent, Judge Bownes argued that it was not reasonable for the agents to impound a car legally parked in a residential neighborhood absent some reason for the agents to believe that the car was in danger or endangered others. *Id.* at 628–29 (Bownes, J., dissenting). In Judge Bownes' view the main difference between cases in which the impoundment of a car had been held to be permissible and the case before him was that other cases relied on factual situations in which it was reasonable for police to believe that the car either could not be legally removed to a more permanent location or it was an immediate target for thieves or vandals or a threat to public safety. *Id.* at 629–630.

**7.** In this connection, I note the Massachusetts Supreme Judicial Court has held a written standard procedure is required in order to conduct a subsequent inventory search. Any inventory search not conducted pursuant to a standard police procedure violates Article 14 of the Declaration of Rights and its fruits must be suppressed. *Commonwealth v. Ellerbe*, 430 Mass. 769, 773 n. 8, 723 N.E.2d 977 (2000); *Commonwealth v. Bishop*, 402 Mass. 449, 451, 523 N.E.2d 779 (1988). To comply with *Bishop*, police inventory procedures "must be in writing and, at least in the case of automobile inventory searches, must specify whether and under what circumstances closed containers should be opened and their contents inventoried." *Commonwealth v. Rostad*, 410 Mass. 618, 620, 574 N.E.2d 381 (1991). *Bishop's* requirement of written police inventory procedures to constrain officer discretion applies broadly to searches conducted without a warrant or probable cause. *Id.* at 622, 574 N.E.2d 381.

larly that whether an appropriate person is available to move the car is central to an evaluation of the reasonableness of any decision to seize a vehicle.[8]

 Accordingly, I conclude that a police decision to impound or tow a vehicle legally parked incident to the arrest of its driver may be permissible if made pursuant to a consistent and reasonable policy or practice that cabins the officer's discretion in such a way that non-investigatory community caretaking functions are furthered. In addition, even in the absence of a consistent policy or practice, the particular decision of an officer to impound or tow may be permissible upon a demonstration that the seizure was a reasonable effort to fulfill non-investigatory community caretaking functions.

### A. The Swampscott Police Department Tow Policy

Both *Bertine* and *Ramos–Morales* emphasized the usefulness of a "standard procedure" that is applied in a uniform fashion to prevent the threat to privacy caused by arresting officers using the seizure of a vehicle as a pretext for conducting an investigative search. *But see Rodriguez–Morales*, 929 F.2d at 787 n. 3 (expressing "no opinion on whether *Bertine* requires that, where impoundment is used as a springboard, the decision to impound must be subject to set procedures").[9]

Such a standard procedure, however, could be quite expansive and open textured. In *Bertine*, for example, removal of the car was authorized when "[t]he driver of a vehicle is taken into custody." 478 U.S. at 369 n. 1, 106 S.Ct. 2988. And the First Circuit validated a policy almost as broad in *Ramos–Morales*. The "unknown location" provision of the DEA policy upheld in *Ramos–Morales*, however, was apparently considered to provide the link to the noninvestigatory interests in preventing vandalism and theft and therefore distinguished it from a wholly standardless policy, which presumably could not pass constitutional muster.

The evidence I received at the suppression hearing regarding what constitutes the Swampscott Police Department's practice regarding towing suggests considerable variety in understanding.[10]

**8.** The Massachusetts Supreme Judicial Court has also recognized the relevance of a practical alternative to impoundment, for example a person present who could remove the vehicle. *See, e.g., Commonwealth v. Ellerbe*, 430 Mass. at 775, 723 N.E.2d 977 ("there was no one immediately available who could remove the vehicle from the lot"); *Commonwealth v. Daley*, 423 Mass. 747, 750 n. 4, 672 N.E.2d 101 (1996) ("no third person was present, the vehicle was unregistered, and had registration plates belonging to another vehicle"); *Commonwealth v. Caceres*, 413 Mass. 749, 752, 604 N.E.2d 677 (1992) ("passenger was not authorized to operate a motor vehicle"). *See also Commonwealth v. Dunn*, 34 Mass.App.Ct. 702, 705, 615 N.E.2d 597 (Mass.App.1993)(relying upon LaFave, *Search and Seizure* § 7.3(c) at 86–87 (2d Ed.1987) for the proposition that "the police would have no justification for impounding the automobile of an arrested driver if it is parked ... on private property of another unless the owner of that property requests that the vehicle be removed").

**9.** In an effort to harmonize the reservation of *Rodriguez–Morales* with case law viewing set procedures favorably in the impoundment and inventory search setting, I find it useful to view set or standard procedures as a safe harbor which can avoid a more particularized case-by-case inquiry into whether a given search was pretextual.

**10.** Officer Cassidy testified that it was the practice of the department to tow a vehicle if an officer arrested its driver and its owner was not present. He admitted that the policy did not set forth any factors that should be considered by an officer in deciding whether the car should be towed or not.

Lieutenant Chadwell testified that the policy authorized police to tow a vehicle "because

This variety is not surprising because a textual analysis of the policy reveals that, while the policy provides instruction of what to do when undertaking to tow, it provides no direction on when to do it. As a consequence, the policy contains no provision to cabin an officer's decision to tow a vehicle in a fashion related to whether it would serve the interests of protecting the property of the owner or the safety of the public. Rather, the testimony of all three officers suggested that practices under the policy permitted the towing of an automobile when its driver was arrested without any meaningful connection to legitimate community caretaking purposes. The policy as described by Chadwell and the brothers Cassidy provides no significant criteria to constrain an officer's discretion in deciding whether to tow a car. Indeed, it is arguable that the decision to tow in this situation actually violated an express condition of the written policy.[11] I con-

---

of an arrest, due to an arrest." He listed as other circumstances under which a car may be towed "public safety issues, accident, vehicle fires for public safety purposes, for blocking access to public places." In addition, he testified that he explained to Sergeant Cassidy over the radio that "where we had the arrest, that we do have an inventory tow policy, we should inventory the vehicle." He further explained that it is appropriate to tow a vehicle when arresting the driver because "we're taking the owner or operator away from the vehicle for a prolonged period of time." The police, he said, tow "to protect our interests as the Swampscott Police and the tow company from false claims of theft .... to protect the operator of that vehicle from any thefts to that vehicle that may have occurred to that vehicle while he was away, and I also wanted to protect the public from any dangerous instrumentalities that may have been in the vehicle." Lieutenant Chadwell then went on to testify that he had no probable cause to believe a weapon was in the car, but that he might have suspected that a gun was present since Goodrich had allegedly committed an armed robbery.

On further questioning, Lieutenant Chadwell testified that he does not understand the policy to direct an officer to have a car towed "anytime someone connected with that car is arrested." Rather, he offered examples of situations in which police would not tow: if a person was arrested in his home with a car legally parked in his own driveway "because it is on private property and it's off the road and it's in his own driveway." Also, if a party was parked "in a friend's driveway ... visiting someone" the police wouldn't tow "if the public didn't have access to that place." He also stated that "the only time a vehicle will be allowed on an arrest to leave is if there is someone who is licensed that is right there."

Chadwell believed that he was describing the oral policy of the Swampscott Police Department based on his 27 years on the force.

Sergeant Cassidy testified that the policy left the decision whether to tow or not in his discretion as ranking officer. He offered no meaningful insight on how that discretion would be exercised. As to the decision to tow the car in this case, Sergeant Cassidy testified that he was justified in towing the car because it was not on private property since the VFW parking lot was owned by the Town of Swampscott, although it was leased to the VFW. He also testified that towing was justified because it was necessary to keep access to two garage bays at the back of the VFW free so the department of public works could access the bays for storage. As I have found in note 2 *supra*, neither of these justifications was not supported by the evidence.

11. The written tow and inventory policy of the Swampscott Police Department required only that the determination to tow a vehicle be made by an "authorizing officer" ranked sergeant or higher who determines that towing the vehicle would be lawful under town ordinances or other statutory authority. In the present case, towing Goodrich's car was arguably contrary to the policy because it violated Mass. Gen. Laws ch. 266, § 120D (the Government concedes that the reference in the Swampscott Motor Vehicle and Tow Policy to § 120A is a typographical error and that § 120D was the intended citation) which prohibits the removal of a car from private property unless the vehicle's operator has been prohibited from parking there by the owner of the property.

The car was legally parked in a private lot and no one had requested that it be towed.

clude the policy could encourage an evidentiary search masquerading as an inventory search and thus result in an invasion of the suspect's constitutionally protected rights. *Cf. United States v. Donnelly*, 885 F.Supp. 300, 306–07 (D.Mass.1995). The standardless Swampscott policy provides no safe harbor from a particularized inquiry whether the community caretaking function was served or the impoundment, with its consequent inventory search, was a subterfuge for an investigatory search. I now turn to that inquiry.

### B. The Decision to Seize and Search the Car

■ A comparison with *Ramos–Morales* is sufficient to demonstrate that when the Swampscott Police chose to perform a search of the car the defendant drove to the VFW Hall, they did so without any reason animated by concern for the owner's property interests or the public safety generally or even for insulating themselves

In fact, the representative of the VFW who was present was Mrs. Goodrich, and she was not consulted about the propriety of leaving the car until its owner could retrieve it. She was discouraged from exerting control over the car or making a decision about whether it could remain on the property. Thus, the police could be said to have violated the explicit terms of Mass. Gen. Laws ch. 266, § 120D.

There is no basis in the text of the statute to conclude that the police are exempt from § 120D. Consequently, the inventory search that accompanied the seizure could be said for that reason to have violated Goodrich's Fourth Amendment rights. *See Skelly v. Oklahoma*, 880 P.2d 401, 405 (Okl.Crim.App. 1994). *Skelly* involved a very similar case in which a car was parked in the parking lot of a motel and therefore the impoundment was contrary to a city ordinance that prohibited the towing of a vehicle from private property except upon the request of the property owner. The court held that "impoundments must be conducted in strict compliance with applicable law in order for their consequent inventory search to be legal," although the evi-

from future controversy concerning the car's contents. The car was seized and "inventoried" solely for investigative purposes.

In *Ramos–Morales*, the police arrested the suspect while he was in his car, leaving no one to whom they could entrust the vehicle. The location of the car was considered "unknown" because the officers did not know what Ramos–Morales's connection to that place was. 981 F.2d at 626. These facts distinguish *Ramos–Morales* from this case. Goodrich was not arrested in his car, but in a building where the police knew his wife was present. His car was parked in a legal parking space in the lot owned by his wife's employer. There was no non-investigatory need for the police to tow Goodrich's car because they could simply have permitted his wife, who was entrusted with the keys by Goodrich— and by the police with delivering property of the car's owner, her sister-in-law—to take immediate responsibility.[12]

dence in that case was held to be admissible because it was not a fruit of the illegal search.

I have, however, neither found nor been directed to governing Massachusetts case law on § 120D as it applies to the police. Consequently I am reluctant to ground my decision on its apparent violation by the police without further instruction from the Massachusetts state courts. I note that the case law has, without directly confronting the issue, been indulgent concerning the propriety of police towing from private property following the arrest of the vehicle's driver. *See Commonwealth v. Dunn*, 34 Mass.App.Ct. 702, 706, 615 N.E.2d 597 (1993) ("the police, responsible for pursuing the vehicle to a stop on private property and, by arrest, leaving it driverless, could reasonably wish to spare the property owner the burden of dealing with the vehicle's presence."); *see also Commonwealth v. Ellerbe*, 430 Mass. 769, 776, 723 N.E.2d 977 (2000) (citing *Dunn* for the same proposition without referring to § 120D).

12. I note there is no credible evidence presented in the instant case that the car was

The Government contends that the police had no obligation to seek out an alternate means for having the car moved from the lot to an arguably safer location. It suggests, rather, that Mrs. Goodrich had an obligation to ask for permission to take the car. I disagree. Since the police obtained the keys from her, or at least intercepted the keys being passed to her, they knew she was authorized by Goodrich to drive the car. Their knowledge of her authority as a custodian for the car and its contents is demonstrated by the fact that they entrusted Goodrich's sister's babyseat into her care on her request and that they entrusted her to notify her sister-in-law that the car was towed. The police officers consistently behaved in such a way as to communicate that they recognized Mrs. Goodrich's authority over the car and its contents, but they chose not to give her the opportunity to exercise that authority in order that they could pursue their investigatory search.

The evidence established not only that the police officers failed to suggest to Mrs. Goodrich that she could take custody of the car, but that she reasonably believed that she was not free to do so, and reasonably believed that to ask to take possession of the car would be futile. The police officers had no reason to take the keys to the car except to enable them to conduct a search of it. It is apparent that they had decided to conduct the search when they first retrieved the keys.

The officers effectively seized the automobile when they left Mrs. Goodrich with only her house keys (or when they otherwise obtained the car keys from her). At that moment, it was reasonable for Mrs. Goodrich to believe that she was not free to exert dominion over the car, nor free to remove it from the premises. She can hardly be faulted for not complaining to police officers later about what was in her view (and plainly in theirs) a completed decision by them. To insist that, in the midst of an arrest, an interested bystander be required—at pains of being held to have abandoned constitutional rights—vigorously to assert her prerogatives, even after police appear to have made their decisions negating those prerogatives plain, can do nothing but invite mischief at the scene and make the inherently difficult job of a police officer more difficult still.

The police officers' decision to have the car searched and towed rather than leave it in Mrs. Goodrich's possession, or parked legally in the lot while its owner came to retrieve it, violated Goodrich's right to be free from unreasonable search and seizure. I find that the police undertook the decision to search the car by an understandable but unconstitutionally satisfied desire to obtain evidence. There was no strong non-investigatory reason for impounding the vehicle; there was no coexistence of investigatory and caretaking function. The decision to search and tow was unmoored from any justifications securing the community caretaking function of the police. The inventory search justification was a pretext for a warrantless investiga-

---

parked illegally or was in immediate threat of vandalism or theft. Lieutenant Chadwell did testify that he believed that the police regularly responded to reports of theft and vandalism in the VFW lot but police records submitted after the hearing show no reported incidents during the relevant period. Chadwell also conceded that if a VFW Hall patron who drove there later was taken by ambulance to receive medical attention, the police would not tow his car. I find that the police could not have reasonably believed that Goodrich's car was in danger if left legally parked in the VFW lot. And, of course, here Goodrich's wife and sister were in a position to arrange for it to be taken from the parking lot to avoid any problems.

tive initiative in violation of the Fourth Amendment.

### III. The Validity of the Consent to Search the Bag

A second exception to the rule that police may not conduct a search without a warrant arises when they have obtained permission to search from the relevant person. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Thus, even if the inventory search was improper, the gun may be admissible if Goodrich's consent to search was validly obtained. Goodrich gave written consent to search his property after Sergeant and Officer Cassidy had brought the duffel bag retrieved from the trunk back to the station. The question presented is whether that consent was invalid because it was tainted by the illegal inventory search.

■ When consent is relied upon as justification for a search, the government bears the burden of showing that the consent was freely and voluntarily given. *See id.* The determination of voluntariness is based on the totality of the circumstances. *See id.* at 223, 93 S.Ct. 2041. Consent is not freely given, and therefore may be rendered invalid, if a reasonable person would have believed that his or her "consent" was required by police officers or coerced. *See Florida v. Bostick,* 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). And when a person is a prisoner, the risk of coercing consent is magnified. *See U.S. v. Navedo–Colon,* 996 F.2d 1337, 1338 (1st Cir.1993); *U.S. v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976).

■ When consent follows an illegal act by the police—whether seizure of a person or search of property—the requirement that consent be voluntary is supplemented by a second distinct requirement: that the consent be purged of the taint of the earlier illegal act. *See Navedo–Colon,* 996 F.2d at 1338. Under the "attenuation" exception to the exclusionary rule, evidence that is in some way the product of illegal police conduct may be admitted if it has become so distanced from the underlying illegal police conduct as to dissipate the taint of the illegal search or seizure. *See Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

■ The exclusionary rule and its exceptions seek to balance the goal of deterring police misconduct and the cost of excluding probative evidence from consideration by a jury. *See Dunaway v. New York,* 442 U.S. 200, 217–18, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *United States v. Liss,* 103 F.3d 617, 621 (7th Cir.1997). The attenuation doctrine recognizes that a "but for" test which excludes all evidence that would not have been uncovered were it not for the initial police illegality risks suppressing evidence when the connection to the illegal search is distant and the deterrence of police misconduct slight. *Brown v. Illinois,* 422 U.S. 590, 599–600, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *see also Dunaway,* 442 U.S. at 217–18, 99 S.Ct. 2248. Accordingly, the attenuation doctrine allows introduction of evidence where the causal connection has been weakened by the passage of time or by the intervention of other factors.

The Supreme Court in *Brown v. Illinois* addressed the issue whether a voluntary confession following an illegal arrest was admissible if the defendant had been read his Miranda rights prior to confessing. The Court held that giving Miranda rights prior to a confession does not per se ensure that the confession is free of the taint of the illegal arrest. *Brown,* 422 U.S. at 602, 95 S.Ct. 2254. Rather, courts must evaluate the particular facts surrounding

the confession to determine whether it "is the product of a free will" such that the causal link between the arrest and the confession is broken. *Id.* at 603, 95 S.Ct. 2254. This is necessary to ensure "that the Fourth Amendment violation has not been unduly exploited." *Id.*

In analyzing whether the taint has been sufficiently diminished, the *Brown* court pointed to three factors: "the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and particularly, the purpose and flagrancy of the official misconduct are all relevant." *Id.* at 603–04, 95 S.Ct. 2254. The burden is on the government to prove that the connection between the illegal arrest and the confession has been broken. *Id.* at 604, 95 S.Ct. 2254. As a prerequisite, of course, the confession itself must be voluntary, i.e. legally obtained. *Id.*

Deployment of the *Brown* factors has not been limited to confessions but has become the test of whether legally obtained evidence gained as a result of prior illegal police conduct is sufficiently attenuated from the underlying illegality in all exclusionary rule contexts. *See United States v. Pimental,* 645 F.2d 85, 86 (1st Cir.1981) (applying *Brown* factors to connection between photo of car and illegal detention); *United States v. Thompson,* 35 F.3d 100, 105 (2d Cir.1994)(applying *Brown* to statements made a month after illegal detention); *United States v. Seidman,* 156 F.3d 542, 548–49 (4th Cir.1998)(involving consent to tape record conversation following illegal entry); *United States v. Melendez–Garcia,* 28 F.3d 1046 (10th Cir.1994) (applying *Brown* factors to determine whether consent to search was tainted by illegal arrest); *U.S. v. Pena,* 924 F.Supp. 1239, 1251 (D.Mass.1996)(consensual search tainted by earlier unconstitutional sweep); *State v. Hight,* 781 A.2d 11 (N.H.2001)(applying *Brown* factors to consent to search following illegal motor vehicle stop).

In cases involving consensual searches, the *Brown* factors are particularly relevant because the consent to search, like the confession, is provided directly by the defendant to the police. In such cases, the taint analysis is applied as an additional assurance of the voluntariness of consent beyond the requirements of *Schneckloth. United States v. McSwain,* 29 F.3d 558, 562 (10th Cir.1994)("The government bears the burden of proving the voluntariness of consent, and that burden is heavier when consent is given after an illegal detention") (citation omitted); *United States v. Chavez–Villarreal,* 3 F.3d 124, 127–28 (5th Cir. 1993) (taint analysis turns on whether consent was "an independent act of free will").

External conditions resulting from the illegal police conduct that make the defendant more likely to consent, such as belief that the search is inevitable, are indicative of taint. In *Chavez–Villarreal* the Fifth Circuit found that the consent to search was tainted by an illegal detention immediately preceding it because it caused the consenting party to believe "that discovery of the incriminating evidence was inevitable." *Id.* at 128 (defendant told he could refuse to consent "but by then refusal seemed pointless"); *see United States v. Maez,* 872 F.2d 1444, 1456 (10th Cir.1989) (consent tainted because police threatened to get a warrant making search inevitable).

■ I turn now to the three *Brown* factors for consideration in light of the evidence presented to me at the suppression hearing: the temporal proximity between the Fourth Amendment violation and the consent, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct. *Brown,* 422 U.S. at 604, 95 S.Ct. 2254.

The temporal proximity of the underlying illegality and the consent is relevant to the strength of the connection between the two. *See Pena*, 924 F.Supp. at 1253. The illegal search and seizure of Goodrich sister's vehicle and the defendant's written consent were in close temporal proximity. Though the time of the vehicle search is not recorded, only 48 minutes passed between Goodrich's arrest and his consent, and the search occurred immediately following the arrest. Goodrich was in police custody throughout this period of time. Moreover, during this time the police made Goodrich aware of the fact that they had the bag with the gun in it. *See id.* (police "exploited" the illegality by pointing defendant to the cocaine wrapper found during the unlawful search). The close proximity of the illegality and the consent weighs heavily in favor of exclusion. *See Pena*, 924 F.Supp. at 1253 (gathering cases).

Intervening circumstances that suggest the presence of an independent act of "free will" or otherwise break the chain of causation are particularly relevant to attenuation analysis. Courts "have previously re-

lied on a subsequent release from custody, an appearance before a magistrate, discussions with a lawyer, and subsequent convictions on unrelated charges as examples of intervening circumstances that are sufficient to break the causal connection between the arrest and consent." *United States v. Delgadillo–Velasquez*, 856 F.2d 1292, 1300 (9th Cir.1988) (citations omitted). None of these intervening events exist here. And unlike *Navedo–Colon*, for example, no investigative steps independent of the improper "inventory search" are available here to provide grounds for "seeking [Goodrich's] consent." 996 F.2d at 1339.

The government, however, contends that advising Goodrich of his right to refuse consent and obtaining his written consent to search were intervening circumstances sufficient to purge the taint of the illegal search. Goodrich's consent may be relevant to the legality of the subsequent search standing alone but it is not sufficient in and of itself to break the chain of causality set in motion by the improper "inventory" search. *McSwain*, 29 F.3d at 562.[13] Moreover, I find that the circum-

---

**13.** I note that certain circuits have suggested a rule that consent to search per se purges illegal searches and seizures of taint. A divided panel of the Seventh Circuit in an opinion by Judge Kanne joined by Judge Easterbrook has held that "a non-custodial voluntary consent should be seen as an independent event behind which we will not probe for improper motivation and which thus serves as a break in any causal claim steaming from an illegal search." *United States v. Liss*, 103 F.3d 617, 621–22 (7th Cir.1997). Judge Ripple, in a separate concurrence expressed puzzlement at "why the majority decides ... to mount a frontal assault on the precedents of the Supreme Court of the United States and this court" when the same result could be reached through the customary *Brown* multifactor analysis. *Id.* at 622. Judge Ripple took the position that "a voluntary consent is a powerful 'intervening factor' that should be weighed in the *Brown* balance, but the Supreme Court

has yet to hold such a consent per se breaks the causal chain. Indeed, *Brown* makes clear that per se rules of this type are unacceptable. 422 U.S. at 603, 95 S.Ct. 2254." *Id.* at 623, 95 S.Ct. 2254 (footnote excluded). Judge Ripple noted in turn that the Tenth Circuit had "experimented" with such a per se rule but appears effectively to have "abandoned" it in *United States v. Melendez–Garcia*, 28 F.3d 1046 [1054] (10th Cir.1994). *Id.* at 1050 n. 2.

The Fifth Circuit appears also to have experimented with such a per se rule in *United States v. Sheppard*, 901 F.2d 1230, 1234 (5th Cir.1990) (citing *United States v. Fike*, 449 F.2d 191, 193 (5th Cir.1971)). *Sheppard*, however, is questionable authority in the Fifth Circuit. The court in *United States v. Pierre*, 932 F.2d 377, 388–90 (5th Cir.1991), so thoroughly distinguished *Sheppard* as to leave virtually nothing of its per se rule viable. The *Pierre* panel decision, however, was vacated

stances under which the consent was given suggest that it was not fully a product of independent "free will" and counsel against finding attenuation.

Prior to defendant's giving written consent to search his car, he overheard the discussion between Officer Waters and Sergeant Cassidy. As a result, the defendant was aware that Cassidy had already searched the car and removed the bag with the gun. I find that Goodrich, knowing that the police had already seized the bag containing the gun, reasonably believed that withholding consent was pointless and as a result yielded to signing the consent. Goodrich would not have offered the information that a gun was in the bag in his trunk or given consent absent his knowledge that the police had found the bag through their impermissible search.

Finally, consideration of the purpose and flagrancy of the official conduct is relevant to the goal of preventing the police from exploiting the illegal conduct. Although the illegal search of the trunk was not flamboyantly flagrant as a Fourth Amendment violation, I do find that the decision to search the car following the arrest was clearly motivated by an unrestrained desire to find evidence despite the lack of a search warrant or probable cause. The discussions between the officers captured on the police tape indicate that the decisions made in connection with the illegal search were knowingly calculated to try to avoid the burdens and uncertainty of seeking a warrant and retroactively cleanse the evidence of its prior taint. The consent to search was requested only after Sergeant Cassidy had already discovered in the trunk a bag that he suspected contained a gun or other evidence and had removed the bag from the car. The police consistently and purposefully acted to circumvent restrictions imposed by the Fourth Amendment.

To permit the police to avoid application of the exclusionary rule by obtaining consent after the preliminaries of the search have essentially been completed and the most suspicious item identified does severe damage to the goal of deterring unconstitutional searches and seizures. "Allowing police to cleanse past illegalities through consent significantly enhances their ability to exploit these illegalities." Note, Joseph Casaccio, *Illegally Acquired Information, Consent Searches, and Tainted Fruit,* 87 Colum. L.Rev. 842, 850 (1987).

I find that all three of the *Brown* factors weigh against a finding of attenuation. I therefore hold that the written consent to search the car was not sufficiently purged of the taint of the Fourth Amendment violation and that the gun must be suppressed.

## IV. Conclusion

For the reasons stated above, I hereby GRANT the motion to suppress the physi-

---

and the subsequent en banc court did not reach the question of attenuation because it found no Fourth Amendment violation. *United States v. Pierre,* 958 F.2d 1304 (5th Cir. 1992). Yet the Fifth Circuit later again distinguished *Sheppard* and applied attenuation analysis to find that the search of a car was tainted by a prior Fourth Amendment violation despite the existence of consent. *United States v. Chavez–Villarreal,* 3 F.3d 124, 128 n. 4 (5th Cir.1993).

Even if it were the law in the First Circuit, the only *per se* rule with continuing viability, that of the Seventh Circuit in *Liss,* would be inapplicable here because Goodrich was in custody when he gave his consent. More fundamentally, nothing in First Circuit law suggests experimentation with a *per se* rule. Indeed, *United States v. Navedo–Colon,* 996 F.2d 1337, emphasizes that the question of taint turns upon "factual determinations," *id.* at 1339, as opposed to a judicial approach which declines to "probe" into all of the relevant facts and circumstances. *Liss,* 103 F.3d at 622.

cal evidence obtained during the search of Goodrich's car.